## SHELL OIL CO., Inc., et al. v. GOODROE et al.
### No. 6226.

Court of Civil Appeals of Texas. Texarkana.
July 25, 1946.

Rehearing Denied Oct. 3, 1946.

**HALL, Chief Justice.**

This is an action brought by appellees, as lessors and royalty owners to cancel an oil and gas lease held by appellants, on an 85-acre tract of land. It is alleged that the lease was executed by appellees, Mrs. Reba Eidson Goodroe, individually and as guardian for her three minor children, in favor of R. E. Anderson, dated August 5, 1935, for a primary term of five years and "as long thereafter as either oil, gas, sulphur or any other mineral is produced from said land by lessee." It was further alleged that the lease is presently owned by Shell Oil Company, and that appellants, David Flesh, Sam Y. Dorfman, Robert Brown and Sam Sklar were claiming an interest in said lands. Appellees alleged further that only one well was drilled on said land during the primary term of the lease and that it "ceased to produce oil, gas or other minerals during the month of July, 1944, and that by reason thereof, under the terms of said oil and gas lease covering said land upon which Shell Oil Company's W. B. Goodroe No. 1 is located, said lease lapsed and terminated." Appellees also alleged in substance that the Shell Oil Company was guilty of fraud in that the royalty owners were induced to accept the sum of $50.02 on or about October 16, 1944, as shut-in royalty. The fraud is alleged to consist of the statement contained in the letter from the Shell Oil Company, accompanying the shut-in royalty checks, that "due to the lack of market for the gas from our Goodroe No. 1 well it has been necessary for us to shut in this well;" that the representation so made by the defendant Shell Oil Company, Inc., were fraudulent in that it represented to the plaintiffs, other than Paul H. Pewitt and Reba Eidson Goodroe and her husband, W. B. Goodroe, that said W. B. Goodroe well No. 1 was shut in due to the lack of a market for the gas, when in truth and in fact there was an ample market for gas at all times.

Appellants' defense to appellees' cause of action is summarized by them, as follows:

"In May, 1938, the Shell, as the then owner of the lease, at an expense of many thousand dollars drilled and completed a

Cary M. Abney, of Marshall, P. G. Henderson, of Jefferson, and Barksdale Stevens and R. H. Whilden, both of Houston, for appellants.

J. H. Benefield, of Jefferson, and J. T. Harris and H. P. Smead, both of Longview, for appellees.

well to Gloyd horizon from which oil was produced in paying quantities from completion of the well until the gas oil ratio rose to such an extent as to render the allowable on the well so low as to require from the standpoint of the interest of the lessee and royalty owners, and the conservation of oil and gas, that the well be recompleted as a gas well. In September, 1939, the Shell recompleted the well in Henderson horizon as a well producing gas only, and promptly connected the well with the Arkansas Louisiana Gas Company pipeline, entered into a contract for the sale of the gas, and continuously thereafter produced gas in paying quantities until it was compelled to shut in the well on July 25, 1944, because during the months of June and July, 1944, from causes beyond the Shell's control, the pressure of the well dropped to such an extent that it would not feed into the line of the gas purchaser, and it was temporarily unable to market the production from the well. It then used reasonable diligence to remedy the causes of the shut in and to market the production, but being unable to do so, on October 16, 1944, paid the royalty owners the shut-in royalty as provided in subdivision B of paragraph 4 of the lease in lieu of production from July 25, 1944, to July 25, 1945. The royalty owners accepted and cashed the checks for the shut-in royalty, and executed written receipts therefor. Thereafter on June 12, 1945, the royalty owners, acting through their attorney, J. H. Benefield, repudiated the lease, and demanded a cancellation thereof, but notwithstanding this the Shell on July 11, 1945, tendered the royalty owners shut-in royalty for the period beginning July 25, 1945, and ending July 25, 1946, but the royalty owners refused to accept the shut-in royalty, and returned the checks to the Shell, claiming that the lease had expired. The owners of two-thirds of the minerals further ratified the lease after the shut-in royalty was paid by executing a deed to T. W. Whaley conveying a royalty interest under the lease, and Whaley conveyed the same interest to Benefield. They offered to pay the shut-in royalty to continue the lease in effect from July 25, 1945, to July 25, 1946, and prayed that the plaintiffs take nothing by their suit; that the top lease

to P. H. Pewitt executed by the other plaintiffs be cancelled, and defendants quieted in their title to the leasehold estate, and for certain other relief not material to these points."

The jury acquitted appellant, Shell Oil Company, of fraud, and answered special issues No. 1 and No. 2 that neither oil nor gas was being produced from said well in paying quantities on July 26, 1944, or July 26, 1945, respectively. Upon this verdict the trial court rendered judgment cancelling the oil and gas lease as prayed for by appellees. This action of the trial court forms the basis of the first six points advanced by appellants. It is appellants' contention that on the date named in the jury's answer to special issue No. 2, namely, July 26, 1945, the oil and gas lease was in full force and effect for the reason that the Shell Oil Company had on October 16, 1944, less than 90 days after it had ceased to market the gas from said well, paid the royalty owners the sum of $50.02 as shut-in royalty, which was specifically provided by the terms of the lease; that the royalty owners had accepted said payments and were estopped from asserting a forfeiture of the lease. The record reflects that the well known as Goodroe No. 1, located upon the land, was drilled in May, 1938, during the primary term of the lease; that it was first drilled to an oil sand and produced oil and gas for a time but the ratio between the oil and gas became so great that the well ceased to be profitable as an oil well and was plugged back in September, 1939, and refinished as a gas well. This contention follows the allegations of appellees. So, at the time of the payment of the shut-in royalty, the well was producing gas only from which a certain amount of condensate, a component part of the gas, was being extracted and sold. The gas, after the completion of the extraction process, was piped into the Arkansas Louisiana Gas Company's pipe line and sold to that company. On or about July 26, 1944, the gas pressure declined to such an extent that the well would no longer flow into the gathering line of the Arkansas Louisiana Gas Company on its own pressure. The only gas line owned and operated by the Arkansas Louisiana Gas Company in this area was

what is known as a high pressure line and when the pressure of the well diminished to where it was equal to or less than the pressure in the gathering line, it would no longer flow into said line. This was the situation on October 16, 1944, when appellant, Shell Oil Company, paid appellees the $50.02 shut-in royalty in compliance with Paragraph 4, Section B, of the lease reading:

"To pay lessor, as royalty for gas from each well where gas only is found, while the same is being sold or used off the premises, one-eighth of the market price at the wells of the amount so sold or used, *and where such gas is not so sold or used lessee shall pay to lessor $50.00 per annum as royalty from each of such wells and while such royalty is so paid such well shall be held to a producing well under paragraph '3' hereof.* While gas from any well producing gas only is being used or sold by lessee, lessor may have enough of such gas for all stoves and inside lights in the principal dwelling house on said land by making lessor's own connections with the well at lessor's own risk and expense." (Italics ours).

Paragraph 3 of said lease is:

"It is agreed that this lease shall remain in force for a term of five (5) years from this date, said term being hereinafter called 'primary term', and as long thereafter as either oil, gas, sulphur or any other mineral is produced from said land by lessee."

Paragraph 8 of said lease is:

"It is specially agreed that in event oil, gas, sulphur or other minerals, is being produced or is obtained from said premises after the expiration of the primary term hereof and said production shall for any reason cease or terminate, lessee shall have the right at any time within ninety (90) days from the cessation of such production to resume drilling or mining operations in the effort to make said leased premises again produce oil, gas, sulphur or other minerals, in which event this lease shall remain in force so long as such operations are continuously prosecuted, as defined in the preceding paragraph, and if they result in production of oil, gas sulphur or other minerals, so long thereafter as oil, gas, sulphur or other minerals is produced from the premises."

We are cited by appellee to the case of Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339, 341, by the Supreme Court. In that case it appears that the lease under consideration was executed April 7, 1930, covering 7,499 acres of land and was for a period of ten years. On December 22, 1939, during the primary term of that lease the Magnolia Petroleum Company drilled and completed a large gas well on the premises but never sold any gas therefrom. No other well was drilled on the land. That lease contained a provision similar to Section B, paragraph 4, of the lease here involved. It is there said:

"Respondents (the Magnolia Petroleum Company) did not pay the fifty dollars royalty on or before April 7, 1940 (the date the primary term ended). They tendered it more than four months thereafter, contending that they could pay it at any time within the year. Petitioners (Freeman and others) declined the tender on the ground that the lease had terminated on April 7, 1940."

The court held that the tender of the shut-in royalty payment came too late and that the lease lapsed for non-production. In the case at bar we have an entirely different situation. Here the well was drilled and completed as a gas well in 1939, during the primary term, and produced gas continuously until July, 1944; and during the production period prior to July, 1944, over $45,000 worth of gas and condensate was marketed from said well. The shut-in royalty payment was made within the ninety-day period, after production ceased, in compliance with paragraph 8 of the lease.

We are also cited to the holdings of our Supreme Court in Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 784, 137 A.L.R. 1032, and Garcia v. King, 139 Tex. 578, 164 S.W.2d 509, and authorities there cited. Both of the above cases involved the question of lapsation of an oil, gas and mining lease after expiration of the primary term because of lessee's failure to produce oil, gas, or other minerals from the leased premises. In Watson v.

Rochmill, supra, after setting out a paragraph in the lease there under consideration, similar in terms to paragraph 3 in the lease here involved and set out above, the court says:

"In the case at bar, however, the cessation of production was not merely a temporary one. There was no production for a period of two years and seven months. The cessation of production for this long period of time was not brought about or induced by any mechanical breakdown or other condition in connection with the well or the equipment used in connection therewith. The demoralized condition of the oil market and the low gravity of the oil in no wise prevented the operation of the well by the lessee for whatever oil it would produce. *These conditions may have rendered it unprofitable to operate the well, but were not contracted against and consequently they did not prevent a lapsation of the lease when production ceased.* Stanolind Oil & Gas Co. v. Barnhill, Tex.Civ.App., 107 S.W.2d 746; Duff v. Du Bose, Tex. Com.App., 27 S.W.2d 122; Live Oak Basin Oil Ass'n v. Reagan, Tex.Civ.App., 289 S.W. 1052." (Italics ours).

The very significant statement emphasized by us in the quotation above implies clearly that the parties to an oil and gas lease may contract against just such a contingency as occurred here. In Stanolind Oil & Gas Co. v. Barnhill, Tex.Civ. App., 107 S.W.2d 746, 749 (writ refused), cited above, it is said:

"Appellants did not contract for a term which would depend upon the possibility of procuring a market for the product at some date subsequent to its express date of expiration. *The lease did not provide that it should remain in force and effect for five years, and as long thereafter as there may be prospects of a market for the product, and it is not the duty of the courts to make contracts for parties but only to construe such contracts as they make for themselves.*" (Italics ours.)

So, in this case it is not our duty to make contracts for the parties nor to determine the wisdom of their undertaking expressed in the contract, but to construe the contract the parties have made. In the case of Garcia v. King, supra, no mention is made of a provision in the lease contract there under discussion by which its primary term may be extended by the payment of a fixed sum, as provided in paragraph 4, Section B, of the lease involved here, and for that reason that case is not in point.

In our opinion, the provision of the lease quoted first above gave the appellant, Shell Oil Company, the assignee of the original lease, the privilege of paying the shut-in royalty in order to keep the lease from lapsing. This is especially true under the circumstances existing at the time the payment was made, taken with the fact, as found by the jury, that no fraud was practiced by the assignee in making the payment. Such payment by the Shell Oil Company was sufficient to extend the life of the lease for one year, or until the 25th of July, 1945. This is true because the plain provision of the lease provides that it may be extended by the payment of the stipulated sum of $50.00. And further, the acts of the appellees in accepting the payment of the shut-in royalty, in our opinion, estops them from contending otherwise.

Before the period covered by the payment of the shut-in royalty had expired, July 25, 1945, appellees' attorney wrote appellant Shell Oil Company, the following letter:

"June 12, 1945.

"Shell Oil Company
"Shell Building
"Houston, Texas.
"Re: Reba E. Goodroe, Thomas Eidson, et al., land—85 acres, more or less, in John Hanks Survey, Marion County, Texas.
"Gentlemen:

"I represent the royalty owners in the land referred to in the caption and upon investigation have concluded that the oil and gas lease formerly held by you, covering said land, has terminated under its own provisions.

"Therefore, this is to demand that you execute and forward to me a proper release of said oil and gas lease.
"Very truly yours,
"J. H. Benefield, Sr."

Prior to the writing of the above letter, on June 2, 1945, appellee, Mrs. Reba E. Goodroe, joined by her husband, W. B. Goodroe, Thomas A. Eidson, Edward E. Eidson and Robert D. Eidson, R. F. Shaw, Norman M. West, and Mrs. Lucille Engle, individually and as community administratrix of the community estate of herself and C. G. Engle, deceased, executed and delivered to one Pewitt an oil and gas lease covering the same 85 acres of land involved here. This lease was not recorded by Pewitt until September 29, 1945. On July 12, 1945, the Shell Oil Company tendered to appellees $50.02 as shut-in royalty for the twelve months' period beginning July 25, 1945, and ending July 25, 1946. This tender was refused by appellees. During the spring of 1945, the Shell Oil Company sold the gas well here involved to the Jefferson Gasoline Company, composed of Rogers Lacy, Sam Dorfman and David J. Flesh, and this company began flowing oil from said well on or about August 22, 1945, just one day before this suit was filed by appellees. It is not necessary to a decision of this case to determine whether the tender of the Shell Oil Company of $50.02 on July 12, 1945, in compliance with the terms of said lease, was sufficient to continue the lease in force. However, we are of the opinion that it did have such effect. We do not, however, base our conclusions upon such tender. It is our opinion that the acts and conduct of appellees in executing the top lease to Pewitt on June 2, 1945, together with the letter of appellees' attorney to the Shell Oil Company dated June 12, 1945, repudiating said lease and demanding the execution of a release of same while said lease was in effect per force of payment of the shut-in royalty, on October 16, 1944, relieved appellants of the duty of operating the gas well located on said lease until the controversy between them and appellees respecting the title to the lease was settled. In Wisdom v. Minchen, Tex.Civ.App., 154 S.W.2d 330, 334 (writ refused), it is said:

"In Morgan v. Houston Oil Company, Tex.Civ.App., 84 S.W.2d 312, 314, it was held: 'It is well settled that when a lessor determines to forfeit or cancel an oil and gas lease, and puts the lessee on notice thereof, he cannot complain if the latter suspends operations under the contract, pending the determination of the asserted right of the lessor to forfeit or cancel. Lane v. Urbahn, Tex.Civ.App., 265 S.W. 1063, par. 3 (writ refused); Edgar v. Bost, Tex.Civ.App., 14 S.W.2d 364; Johnson v. Montgomery, Tex.Civ.App., 31 S.W.2d 160 (writ refused).' See, also, Gwynn v. Wisdom, 119 Tex. 320, 30 S.W.2d 298. The owners of the working interest were not bound therefore to continue after such notice of forfeiture to develop the lease, and the lease will not be held to have expired because they did not continue such development. We overrule appellant's contention that the evidence established that the lease expired by its own terms, in that it ceased to produce oil in paying quantities after the primary term of five years, and in that the owners of the working interest did not continue development."

It is our opinion that the trial court erred in rendering judgment for appellees cancelling the lease. The judgment should have been rendered for appellant, quieting their title to the oil, gas and other mineral leasehold estate in said land.

The judgment of the trial court is reversed and judgment is here rendered for appellants.