SKELLY OIL COMPANY, Petitioner

V.

MATTHEW HARRIS ET UX, Respondents

No. A-8224.   Decided January 3, 1962
352 S.W. 2d 950

C. E. Blodget, Tulsa, Oklahoma, *Ramey, Brelsford, Hull & Flock,* Tyler, for petitioner.

*LeRoy Salle* and *Crawford Parker, Jr.,* Carthage, for respondents.

ASSOCIATE JUSTICE RUEL C. WALKER delivered the opinion of the Court.

In Gulf Oil Corp. v. Reid, 161 Texas 51, 337 S.W. 2d 267, it was held that an oil and gas lease had terminated where there was no production or tender of shut-in royalty for a period of thirty-two days following the capping of a well begun before and completed after the end of the primary term. Under somewhat similar facts but different lease provisions, we hold that the lease in the present case was kept in force by production which began forty-one days after completion of a well beyond the primary term on land with which part of the leased premises was pooled.

The cause was submitted to the trial court on an agreed statement of facts. On October 21, 1943, Matthew Harris and wife, respondents, executed and delivered to W. H. Oberthier an oil and gas lease covering nine tracts, aggregating 550.52 acres, in Panola County. A few months later the lease was assigned to Skelly Oil Company, petitioner. The instrument provides for a primary term of ten years and authorizes the lessee to pool the land described therein or any part thereof with other lands or leases in the immediate vicinity. All provisions necessary to an understanding of the contentions made by the parties are quoted in the margin with the third sentence of Paragraph 6, hereinafter referred to as the 60-day clause, set out in italics.[1] The emphasis there and elsewhere in this opinion is supplied.

---

1. "2. Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called 'primary term') and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.

A written declaration pooling 59.59 acres covered by the lease with other land in the vicinity to constitute a 640-acre unit, designated as the Shivers-Hamilton Unit, for the production of gas, distillate and condensate was filed for record on October 5, 1953. On that date petitioner also commenced operations for drilling a well at a location in the Shivers-Hamilton Unit but not on any of the land described in the Harris lease. After clearing the drilling site, erecting a derrick, and setting up a drilling

---

"3. The royalties to be paid by Lessee are: * * * where gas from a gas well is not sold or used, Lessee may pay as Royalty $100.00 per well per year and if such payment is made it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; * * *

"4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof with other land, lease or leases in the immediate vicinity thereof, when in Lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said premises in compliance with the spacing rules of the Railroad Commission of Texas or other lawful authority, or when to do so would, in the judgment of Lessee promote the conservation of the oil and gas in and under and that may be produced from said premises. Lessee shall execute in writing an instrument identifying and describing the pooled acreage. The entire acreage so pooled into a tract or unit shall be treated, for all purposes except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated as if production is had from this lease, whether the well or wells be located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified, Lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved.

*     *     *

"6. If prior to discovery of oil, gas or other mineral on said land or on acreage pooled therewith Lessee should drill a dry hole or holes thereon, or if after discovery of oil, gas or other mineral, the production thereof should cease from any cause, this lease shall not terminate if Lessee commences additional drilling or reworking operations within 60 days thereafter or if it be within the primary term, commences or resumes the payment or tender of rentals or commences operations for drilling or reworking on or before the rental paying date next ensuing after the expiration of 60 days from date of completion of dry hole or cessation of production. If at any time subsequent to sixty (60) days prior to the beginning of the last year of the primary term and prior to the discovery of oil, gas or other mineral on said land, or on acreage pooled therewith, Lessee should drill a dry hole thereon, no rental payment or operations are necessary in order to keep the lease in force during the remainder of the primary term. *If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the lease shall remain in force so long as operations are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith.* In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within one hundred fifty (150) feet of and draining the leased premises, or acreage pooled therewith, Lessee agrees to drill such offset wells as a reasonable prudent operator would drill under the same or similar circumstances."

rig, petitioner began actual drilling of the well on October 17, 1953. All of the foregoing events occurred during the primary term, which expired on October 21, 1953.

The drilling operations were prosecuted continuously until November 24, 1953, when the well was completed and capped. It was then capable of producing gas and condensate in paying quantities, but no shut-in gas royalty was ever paid or tendered. Petitioner requested and obtained an allowable from the Railroad Commission, arranged for Carthage Corporation to extend its gas gathering lines to the well, installed the necessary meters and meter stations, and negotiated a contract with Arkansas-Louisiana Gas Company for sale of the gas from this and other wells in the area. Production of gas from the well began on January 4, 1954, and has continued without interruption from that date to the present time. Sundry additional wells which were later drilled on other units that included different parts of the land covered by the lease have no bearing on the question presented for decision.

The trial court concluded that the lease had terminated on November 24, 1953, by reason of petitioner's failure to pay shut-in royalties or otherwise maintain the lease in force on or after that date. Judgment was accordingly entered in favor of respondents and the Court of Civil Appeals affirmed on the authority of the Reid case, 341 S.W. 2d 693. As indicated above, the facts of the Reid case are similar in many respects to those here involved, but the provisions of the two leases are materially different. One of the clauses which Gulf there sought to invoke became operative upon cessation of production after expiration of the primary term. The other provided that in the event no mineral was being produced but the lessee was engaged in drilling or reworking operations at the end of the primary term, the lease would not terminate if the lessee did not allow more than the sixty days to elapse between abandonment of one well and the commencement of drilling or reworking operations on another until production was obtained. We pointed out that neither of such clauses could extend the term of the lease, because there had been no cessation of production and the well was never abandoned.

Paragraph 6 of the lease in the present case does not deal merely with cessation of production or the completion of a dry hole after expiration of the primary term. The third sentence comes into play when there is no production at the end of the primary term but drilling or reworking operations are then in

progress. It stipulates that in such event the lease shall remain in force if the operations are prosecuted and result in production as therein provided. The purpose of this provision is to enable the lessee to maintain the lease by obtaining production as a result of diligent prosecution of the very operations which were in progress at the expiration of the primary term, and a precise yet quite liberal standard of diligence is prescribed. See Rogers v. Osborn, 152 Texas 540, 261 S.W. 2d 311; Stanolind Oil & Gas Co. v. Newman Bros. Drilling Co., 157 Texas 489, 305 S.W. 2d 169.

■ Respondents contend that the 60-day clause has no further application after the lessee has completed a well capable of producing in commercial quantities. They insist that its only purpose is to prevent termination of the lease during any brief periods that may be required by the lessee to make tests, decisions and alterations in equipment in an attempt to complete the well as a producer. We are urged to say that when the operations in progress at the end of the primary term have resulted in the discovery of oil or gas in paying quantities and a well capable of commercial production has been completed, the lease can thereafter be kept in force only by actual or constructive production. Respondents recognize that the clause will maintain the lease during temporary periods of inactivity to enable the lessee to continue good faith efforts to complete either a producer or a dry hole, but they argue that when the same is read in connection with the shut-in royalty clause, it does not allow a period of sixty days after final completion of drilling operations within which to pay shut-in royalty or begin production from the well.

■ We do not think the lease provisions are subject to the construction urged by respondents. Under the terms of the shut-in royalty clause, the lessee *may* pay the stipulated amount per well per year and *if* such payment is made it will be considered that gas is being produced within the meaning of Paragraph 2. This does not suggest that the lessee is under a duty to make such payment, or that the shut-in royalty clause provides an exclusive method for maintaining the lease in force, when a well capable of producing in commercial quantities has been completed and capped.

As pointed out in Stanolind Oil & Gas Co. v. Newman Bros. Drilling Co., supra, the habendum clause is required by its own terms to yield to any and all other provisions which affect the duration of the lease. One of these provisions states that under

the circumstances which existed at the end of the primary term in this case, the lease shall remain in force so long as operations are prosecuted with no cessation of more than sixty consecutive days. The parties also provided, in effect, that if such operations result in *production,* the lease shall continue in effect *as long thereafter* as oil, gas or other mineral is produced from the leased premises or acreage pooled therewith. Although discovery of oil or gas is mentioned several times in the first two sentences of Paragraph 6, the 60-day clause does not stipulate that the lease shall be maintained by production after the operations result in discovery of minerals or the completion of a well capable of producing.

"Cessation" is defined by Webster as "a temporary *or final* ceasing or discontinuance (as of action)". Webster's Third New International Dictionary. There is nothing to indicate that the term was used in any other sense, or that the parties were referring to a cessation occurring at any particular period in the well's history. When the language of the 60-day clause is given its ordinary and commonly accepted meaning, it contemplates and permits either a temporary interruption or a final discontinuance of the operations in progress at the end of the primary term. If such operations result in production at a time when there has been no cessation of more than sixty consecutive days, the lease remains in force so long thereafter as production continues. The 60-day clause thus allows the lessee that period after completion of a well capable of producing within which to begin either actual or constructive production. If the work in progress at the end of the primary term results in a dry hole prior to discovery of oil, gas or other mineral, the first sentence in Paragraph 6 specifically grants the lessee sixty days within which to commence additional drilling or reworking operations. See Stanolind Oil & Gas Co. v. Newman Bros. Drilling Co., supra.

Respondents also contend that under the facts of this case the lease has terminated even though the lessee would ordinarily have sixty days after completion of a well beyond the primary term within which to begin production. Since the well was not drilled on the land described in the lease but on acreage pooled therewith, they insist that the 60-day clause has no application and that the lessee must look to and comply with the requirements of the habendum and pooling clause if the lease is to remain in force after expiration of the primary term. In support of this argument, respondents point out that the pooling clause declares that production from pooled acreage shall be treated as if production is had from the lease but does not state

in so many words that drilling operations on pooled acreage shall have the same effect as operations conducted on land described in the lease. They also direct our attention to the commas which set off the phrase "or on acreage pooled therewith" in the 60-day clause and to the absence of such punctuation where the same phrase appears in the first sentence of Paragraph 6, and contend that the word "thereon" as used in the former refers only to the land described in the lease. We do not agree.

■ The second sentence of Paragraph 4 states plainly and unequivocally that except with respect to the payment of royalties on production, the entire acreage pooled into a unit shall be treated *for all purposes* as if it were included in the lease. Having excepted the matter of royalty payments on production from this sweeping declaration, the parties then dealt specifically with the legal consequences of production from a pooled unit and the royalties which the lessor would be entitled to receive therefrom. It seems clear to us that these provisions were not intended to limit the scope and effect of the second sentence in the paragraph as contended by respondents. From a consideration of the entire lease, the terms of the 60-day clause, and the other provisions of Paragraph 6, it is our opinion that drilling in progress at the end of the primary term on pooled acreage has the same legal effect as similar operations conducted on land described in the lease.

No mineral was being produced from the land described in the Harris lease or from acreage pooled therewith at the end of the primary term. The lessee was then engaged in drilling operations on the Shivers-Hamilton Unit. Such operations were prosecuted with no cessation of more than sixty consecutive days until they resulted in production, which has continued to the present time. The requirements of the 60-day clause have thus been satisfied in every particular, and under its provisions the lease is and will remain in full force and effect so long as oil, gas or other mineral is produced from the leased premises or acreage pooled therewith.

The judgments of the courts below are reversed and the cause is remanded to the district court with instructions to render judgment for petitioner.

Opinion delivered January 3, 1962.