Pablo **MAYERS**, Sr., John Mayers and Pablo Mayers, Jr., Appellants,

v.

**SANCHEZ–O'BRIEN MINERALS CORP., Appellee.**

No. 04–82–00059–CV.

Court of Appeals of Texas, San Antonio.

March 28, 1984.

Rehearing Denied April 19, 1984.

Francisco J. Saldana, Jr., Mann, Cronfel, Dickinson & Saldana, Laredo, for appellants.

Danato D. Ramos, Person, Whitworth, Ramos Borchers & Morales, Laredo, Michael P. Graham, Larry D. Carlson, Baker & Botts, Houston, for appellee.

Before BUTTS, TIJERINA and DIAL, JJ.

## OPINION

DIAL, Justice.

This is an appeal from a summary judgment in an oil and gas case. Sanchez-O'Brien and Chevron filed a joint motion for summary judgment with affidavits asking the trial court to declare their three oil and gas leases with the Mayers valid and in full force and effect. The Mayers filed their own motion for summary judgment asking for a judgment declaring that the leases automatically terminated as a result of the failure of the lessee to pay the shut-in royalty as required by the lease. The court granted the motion for summary judgment by Sanchez-O'Brien and denied the motion filed by the Mayers. The judgment of the trial court declared that the leases were valid, subsisting, and in full force and effect. The summary judgment severed the damages part of the case. It is from the granting of the Sanchez-O'Brien motion for summary judgment and the denial of their own motion for summary judgment that the Mayers take this appeal.

The parties to this suit entered into a stipulation of facts. The Mayers, as lessors, executed the three oil and gas leases on June 14, 1973. Each lease had a primary term of five years, the primary term to end on June 14, 1978. Chevron, as lessee, became the owner of the three leases and before the end of the primary term assigned part of its interest as lessee to Sanchez-O'Brien. Before the end of the primary term, Sanchez-O'Brien began drilling operations for Well No. 1. This well was completed as a gas well on July 8, 1978, approximately one month after the end of the primary term. Well No. 1 was capable of producing gas in paying quantities but was shut-in on the same date it was completed. Under the terms of the three leases, Sanchez-O'Brien had ninety (90) days from July 8, 1978, or until October 6, 1978, in which to tender to the Mayers the required shut-in royalty payments in order to perpetuate the leases, absent actual production or commencement of additional operations prior to that date.

On August 10, 1978, Sanchez-O'Brien paid the Mayers shut-in royalty payments in the amount of $2.00 per acre. The shut-in royalty payments were made through the depository banks named by the Mayers in the three respective leases. The August 1978 shut-in payments were made by checks accompanied by receipts. Both the checks and the receipts for each of the payments stated that the payments were for a twelve month period "beginning 10/6/78." After depositing the shut-in payment checks in the appropriate accounts, each of the banks signed the receipts accompanying the checks and returned them to Sanchez-O'Brien. The undisputed summary judgment evidence is that the Mayers did not see either the checks or the receipts.

On September 17, 1979, the Mayers instructed the depository banks not to accept tender of any shut-in royalty payments from Sanchez-O'Brien. The Mayers also informed Sanchez-O'Brien that the shut-in payments required to keep the lease in force had been due August 10, 1979. On September 18, 1979, Sanchez-O'Brien attempted to tender their shut-in royalty pay-

ment to the Mayers but the three banks refused the tender. On October 2, 1979, Well No. 1 was put on line producing oil and gas. It is the expiration date of the shut-in period that is the dispute in this case.

The appellants bring two points of error which include four "subpoints." Appellants contend that the trial court erred in granting the Sanchez-O'Brien motion for summary judgment and denying their motion for the same because the summary judgment evidence establishes, as a matter of law, that each of the oil and gas leases terminated for failure of the appellees to pay the required shut-in royalties on or before one year from the date the first payment was made in order to maintain the leases in full force and effect. The failure to make a timely shut-in royalty payment should have resulted in the automatic termination of the three oil and gas leases. The Mayers maintain that August 10th was the anniversary date of the first shut-in royalty payment and since appellees failed to tender payment on or prior to that date, the leases terminated.

Appellees contend that the anniversary date of the shut-in royalty payment was October 6, 1979 as per the notation on the checks and receipts sent to the Mayers on August 10, 1978. The Mayers contend the anniversary date is August 10th because that was the date the shut-in payment was credited to their account by the named depository bank. We hold the anniversary date of the shut-in payment to be October 6 as per the notations on the check and receipt that was signed by the depositing bank and returned to Sanchez-O'Brien.

When both parties file motions for summary judgment and one motion is granted and the other is overruled, the trial court's judgment becomes final and appealable. On appeal, the court of appeals should determine all questions presented, including the propriety of the order overruling the losing party's motion for summary judgment. *Tobin v. Garcia*, 159 Tex. 58, 316 S.W.2d 396, 400 (1958). When parties file opposing motions for summary

judgment, each movant has the burden to prove that he is entitled to judgment as a matter of law, and neither party can prevail because of the failure of the other to discharge his burden. *Miller & Freeman Ford v. Greater Houston Bank*, 544 S.W.2d 925, 926 (Tex.1976). In a summary judgment proceeding the burden is on movant to establish, as a matter of law, all elements constituting his cause of action or his defense. All doubts as to the existence of a genuine issue of material fact are resolved against the movant. *Great American Reserve Insurance Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965).

Sanchez-O'Brien completed and shut-in Well No. 1 on July 8, 1978. Under the following paragraphs, the first shut-in payment was due ninety days later, on October 6, 1978. Printed paragraph 3 of the leases contains the following shut-in royalty payment clause:

Lessee may pay as royalty, on or before ninety (90) days after the date on which (1) said well is shut-in, or (2) the land covered hereby or any portion thereof is included in a pooled unit on which a well is located, or (3) this lease ceases to be otherwise maintained as provided herein, whichever is the later date, and thereafter *at annual intervals on or before the anniversary of the date the first payment is made*, a sum equal to the amount of the annual rental payable in lieu of drilling operations during the primary term on the number of acres subject to this lease at the time such payment is made, *and if such payment is made or tendered, this lease shall not terminate, and it will be considered that gas is being produced from this lease in paying quantities;* ... [Emphasis ours.]

Typewritten paragraph 15 of the lease also contains the following shut-in royalty clause:

While there is a gas well on this lease or on acreage pooled therewith, which is capable of producing gas or gas and liquified hydrocarbons, in paying quantities,

but said gas is not being sold, Lessee, during the primary term of this lease, commencing on the anniversary date hereof or 90 days from the date of completion of such well, whichever date occurs first may pay Lessor the sum of two ($2.00) Dollars per acre on the number of acres on which this lease is considered to be in force, *which payment is herein called "Shut in Gas Payment" and thereafter said sum may be paid at annual intervals on or before the anniversary date of said first payment, and if such payments are made or tendered, this lease shall not terminate* during the primary term hereof. After expiration of the primary term and for and during a period of three (3) years thereafter Lessee, may continue to make shut-in gas payments and continue this lease in force and effect in the same manner provided in the preceding clause ... [Emphasis ours.]

Had Sanchez-O'Brien made the first payment on October 6, 1978, that payment would without question have kept the leases alive until October 6, 1979. Instead, Sanchez-O'Brien made the first payment on August 10, 1978, fifty-seven days *early.* The Mayers now contend that because Sanchez-O'Brien did not make the second payment on August 10, 1979, they should be penalized by losing the leases. The Mayers request that we terminate the leases because Sanchez-O'Brien paid early. We cannot agree.

Although normally the date of capping of the well or the date of the shut-in royalty will determine the anniversary date of further royalty payments, it is customary for the lessee to send a "Shut-in Royalty Receipt" to the depository bank of the lessor, one copy of which is stamped by the bank and returned to the lessee to indicate that the payment was timely received. The receipt often sets forth a description of the lease, the land involved, the parties being paid, and the period for which the payment is being made. It has been held that the period of payment shown on the receipt is controlling as to the period of time covered by the payment. R. HEMINGWAY, LAW OF OIL AND GAS § 6.5 at 313 (1983), *Steeple Oil & Gas Corp. v. Amend,* 337 S.W.2d 809, 811 (Tex.Civ.App.—Amarillo 1960, writ ref'd n.r.e.); *Shell Oil Company v. Goodroe,* 197 S.W.2d 395, 399 (Tex.Civ. App.—Texarkana 1946, writ ref'd n.r.e.).

█ In *Amend,* the shut-in royalty payment was made on September 24, 1957 and recited that it was paid for the period from August 9, 1957 to August 9, 1958. The second payment was made September 22, 1958, within a year from the first payment, but not within a year from the date recited upon the receipt. The court held that the parties were bound by the period shown on the receipt. In *Goodroe,* the well was shut-in on July 25, 1944. The shut-in royalty was not paid until October 16, 1944, which was a timely payment within the 90-day continuous operations clause in the lease. The shut-in royalty receipt stated that the royalty was paid for the period from July 24, 1944 to July 25, 1945. The court held that the tender, refused by the lessor, on July 12, 1945 was good and that the period indicated in the receipt would constitute the period during which the royalty payment was effective. *Hemingway, supra* at 314. Therefore, in accordance with the holdings in *Goodroe* and *Amend, supra,* we conclude that the receipt and notation on the check tendered by appellees on August 10, 1978, clearly set October 6, 1979 as the anniversary date for the subsequent shut-in royalty payment.

In their joint motion for summary judgment, Chevron and Sanchez-O'Brien maintained that even if the shut-in royalty payment made August 10, 1978, preserved the leases only until August 10, 1979, the leases remained in full force and effect pursuant to paragraphs 3 and 15, quoted above, and 6 of the leases in question.

Paragraph 6 of the leases contains the following cessation of production clause:

If prior to discovery and production of oil, gas or other mineral on said land or on acreage pooled therewith, Lessee should drill a dry hole or holes thereon, *or if after discovery and production of*

*oil, gas or other mineral, the production thereof should cease, this lease shall not terminate if Lessee commences operations for drilling or reworking within sixty (60) days thereafter* ... [Emphasis ours.]

The appellees assert that the cessation of production provisions of the respective leases operated, in effect, to give the lessee an additional sixty days (60) beyond August 10, 1979, in which to resume operations or commence production from the oil well.

■ An oil and gas lease such as the one we have before us creates a determinable fee in the land which terminates upon the happening of the events upon which it is limited. *W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27 (1929); *Texas Co. v. Davis*, 113 Tex. 321, 255 S.W. 601 (1923). The provision in the lease for the payment of shut-in royalty is to provide for continuation of the lease, where gas has been discovered in paying quantities, but a market is lacking. Therefore we have concluded that under the terms of the habendum clause and the cessation of production clause in these leases, the shut-in payment acts as constructive production if within the 60 days after the expiration of the shut-in payment period actual oil, gas, or other mineral is produced.

Appellees contend the above pertinent provisions of the leases, along with the habendum clause, when read together, operated to extend the life of the leases beyond August 10, 1979. Paragraph 2, the habendum clause reads: "Subject to the other provisions herein contained, the lease shall be for a term of five (5) years from this date (called "primary term") and as long thereafter as oil, gas or other mineral *is produced* from said land."

■ Appellees maintain that the cessation of production clause applies when the following events occur: 1) discovery of oil, gas or other minerals; 2) production of oil, gas or other minerals; 3) cessation of production for any cause; and 4) commencement of operations for drilling or reworking within sixty (60) days after cessation of production. Sanchez-O'Brien relies on *Skelly Oil Co. v. Harris*, 163 Tex. 92, 352 S.W.2d 950 (1962) and *Citizens National Bank v. Socony Mobil Oil Co.*, 372 S.W.2d 718, 724 (Tex.Civ.App.—Amarillo 1963, writ ref'd n.r.e.) for the proposition that the failure to pay the shut-in royalty payment on time automatically brings the 60-day cessation of production clause into operation, thus allowing the lessee 60 days in which to begin actual production from the shut-in well or to rework or commence additional drilling. We agree.

In *Harris*, four days prior to the end of the primary term, the lessee commenced the drilling of a well and completed the well as a shut-in gas well. Actual production from the shut-in well began forty-one days after the well had been shut-in. Skelly had not tendered any shut-in royalties as permitted by the lease. The Supreme Court held that the drilling clause in *Harris* did not require the abandonment of one well and the commencement of drilling or reworking operations on another well as a condition precedent to the operation of the sixty (60) day contractual provision perpetuating the lease. The lessee completed the well on November 24 and January 4 commenced actual production. This, as the Court pointed out, was well within the sixty-day provision of the lease. The drilling provision found in the *Harris* lease is essentially the same as the one in the present case.

As the Court in *Harris* stated:

Under the terms of the shut-in royalty clause, the lessee *may* pay the stipulated amount per well per year and *if* such payment is made it will be considered that gas is being produced within the meaning of Paragraph 2 (the habendum clause). This does not suggest that the lessee is under a duty to make such payment, or that the shut-in royalty clause provides the exclusive method for maintaining the lease in force, when a well capable of producing in commercial

quantities has been completed and capped.

352 S.W.2d at 953.

■ The habendum clause is required by its own terms to yield to any and all other provisions which affect the duration of the lease. *Stanolind Oil & Gas Co. v. Newman Bros. Drilling Co.*, 157 Tex. 489, 305 S.W.2d 169, 173 (1957). One of these provisions states that if after discovery and production of oil, gas or other minerals, the production thereof should cease for any cause, the lease shall remain in force so long as operations are prosecuted with no cessation of more than sixty consecutive days. The parties also provided, in effect, that if such operations result in production, the lease shall continue in effect as long thereafter as oil, gas or other mineral is produced from the leased premises via the habendum clause. The Court in *Harris* stated that there is nothing to indicate that the parties were referring to a cessation occurring at any particular period in the well's history. *Id.* at 953.

In *Citizens*, sixteen days before the end of the primary term, the appellee commenced the drilling of an oil well. The well was completed after the end of the primary term. In accordance with the lease provisions, appellee timely paid shut-in gas payments for two years. It was conceded that the lease was in force until September 19, 1959. On September 12, 1959, appellee commenced the drilling of an additional well which was placed on production on November 9, 1959. The Court held the production of gas on November 9th came within the sixty-day clause. The Court held:

> The shut in royalty clause does not provide for an exclusive method for continuing the lease in effect even though a producing well has been completed and capped. Here the lessee chose to commence drilling operations for the third time and completed a producing well within the clear meaning of the sixty-day clause. The unambiguous language of this clause provides that if such operations result in production when there has

been no cessation of more than sixty consecutive days, the lease remains in force so long as production continues. 372 S.W.2d at 724.

The court in *Citizens*, therefore analogized the period that the lease is held in effect by the payment of shut-in royalties to be the contractual equivalent of actual production, to the extent that the extension period of the continuous operations clause will apply at the expiration of the period that the shut-in royalty is payable. Thus, under this approach, if an oil company were keeping the lease in effect by payment of shut-in royalties, at the end of the payment period, under a *Harris* type clause, the lease would not terminate for an additional 60-day period. This 60-day extension would be for all purposes. *Hemingway, supra*, § 6.9 at 333.

This is based on the rationale that by treating shut-in royalty payments as equivalent to actual production, the expiration of the period for which the payment is made is the same as cessation of actual production. Hence, under this approach, cessation of constructive production is equal in operative effect to cessation of actual production. This result is the logical extension of the statement in most oil and gas leases that while payment of shut-in royalties is being made it will be considered that "gas is being produced from this lease in paying quantities." *Id.* at 334.

In the case at bar, appellants contend the three leases were in force up until August 10, 1979. When the appellees failed to tender payment on or before this date, appellants allege the leases terminated automatically by their own provisions. The summary judgment evidence contains affidavits by appellees that Well No. 1 was put on line on October 2, 1979, and has been producing oil and gas ever since that date. Therefore, appellees maintain, the 60-day cessation of production clause came in operation and actual production began within the 60 days.

The Mayers rely on *Gulf Oil Corp. v. Reid*, 161 Tex. 51, 337 S.W.2d 267, 271 (1960) and *Steeple Oil & Gas Corp. v.*

*Amend, supra,* to defeat operation of the cessation of production clause. Appellants contend *Reid* and *Amend* dictate that the sixty-day cessation of production clause did not come into effect because there was no production, hence there can be no cessation of production.

In *Reid* our Supreme Court was faced with an assertion that an oil and gas lease had terminated for failure to make timely payment of shut-in gas royalty notwithstanding the fact that Gulf had completed a well undisputedly capable of producing gas in substantial paying quantities. Gulf attempted to construe the "Commence Drilling" clause of the lease so as to supply a meaning which would have permitted it to have a period of sixty days following the shutting-in of the well in which to tender the shut-in gas royalty called for by the lease in order to perpetuate its leasehold estate. Gulf did not meet the requirements of the dry hole drilled during the primary term, nor did they qualify for the cessation of production during the primary term since the Gulf well was completed *after* the primary term. Gulf then attempted to turn to the portion of the drilling clause which provided generally that if at the end of the primary term there should be no production but if the lessee at that time should be engaged in drilling or reworking operations, the lease would remain in force so long as no more than sixty days elapsed between the abandonment of one well and the commencement of drilling or reworking operations on another. The Court found that there had been no abandonment of the well so, of course, this provision was also inapplicable. The Court held that the Reid lease had terminated by its own terms. *Harris* is clearly distinguishable from the *Reid* case on the grounds of the wording of the commence drilling, cessation of drilling and resumption of operations clause in the lease.

As stated earlier, the court in *Amend,* following the language of *Reid,* held that the tender of the shut-in royalty which fixed a period from August to August as the "year" for shut-in gas royalty purposes was binding on the parties and that a tender of additional shut-in gas royalties after August 9, 1958, was not effective to perpetuate the lease under the shut-in gas clause. The appellees in *Amend* argued that the cessation of production clause provided a sixty-day period after August 9, 1958, in which to make the next shut-in payment. The *Amend* court held that, as in the *Reid* case, since no oil, gas or other minerals had ever been produced by the shut-in well there could be no cessation of production. More precisely, *Amend* stands for the proposition that once a lease is held by the payment of shut-in royalties, the cessation of production clause does not provide a grace period for the late payment of subsequent shut-in payments. In the case at bar, Sanchez-O'Brien began actual production before the end of the 60-day cessation of production clause, consequently this case does not fall under the dictates of *Amend.*

■ In review of a summary judgment, the appellate court must ascertain whether the movant has established his entitlement to a summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law. *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979). The trial court in this case could have granted summary judgment on any one of the three theories raised by the appellees in their motion for summary judgment if evidence was presented to support its contention as a matter of law. *Gonzalez v. City of Mission,* 620 S.W.2d 918, 920 (Tex.Civ.App.—Corpus Christi 1981, no writ)

In summary, the trial court's action in granting the summary judgment can be sustained on the theory that the requirements of the sixty day clause in these particular leases were fully complied with as detailed in *Harris* and *Citizens.* Therefore, we hold that the three leases will remain in full force and effect so long as oil, gas or other minerals is produced from the leased premises.

The judgment of the trial court is affirmed.