**FROST NATIONAL BANK, Appellant,**

v.

**Robert S. MATTHEWS, Jr., et al., Appellees.**

**No. 9458.**

Court of Appeals of Texas, Texarkana.

June 3, 1986.

Rehearing Denied July 1, 1986.

Charles R. Roberts, Foster, Lewis, Langley, Gardner & Banack, San Antonio, John W. Petry, Petry & Petry, Carrizo Springs, for Frost Nat. Bank of San Antonio.

Hubert W. Green, Robert W. Loree, Green & McReynolds, San Antonio, for John D. Gauntt, Jr.

S. Cass Weiland, James L. Walker, San Antonio, for Robert S. Matthews, Jr.

BLEIL, Justice.

Frost National Bank of San Antonio appeals the granting of a summary judgment in favor of Robert S. Matthews, Jr., et al, which terminated Frost's oil, gas and mineral lease. Frost also appeals an adverse summary judgment on its counterclaim and crossclaim of tortious interference with a contract and conspiracy to tortiously inter-

fere with a contract against Matthews and John D. Gauntt, Jr. Gauntt, an intervenor, appeals the granting of the summary judgment which terminated Frost's oil, gas and mineral lease.

Issues raised include the propriety of granting summary judgment when the movant is the plaintiff and when the movant is the defendant; the interpretation of *force majeure* and shut-in gas royalty provisions in an oil, gas and mineral lease; and the requirements of an action for tortious interference with a contract and an action for civil conspiracy to tortiously interfere with a contract.

On December 7, 1982, Frost acquired the working interest in an oil, gas and mineral lease in Zavala County through foreclosure. The lease was executed in 1974 by Matthews or his predecessors in title. The lease had already been extended beyond its primary term when it was acquired by Frost. There were producing gas wells on the property. On December 29, 1982, the gas wells on the property were shut-in pursuant to written orders of the Texas Railroad Commission.

Frost made shut-in gas royalty payments on January 26, March 3, March 29, April 29, and May 26, 1983. Production of gas from the property resumed on June 23, 1983.

In January, 1984, Matthews filed suit to obtain a declaratory judgment that the lease had terminated. Gauntt intervened as a defendant because he claims an interest in the lease superior to that of Frost. Gauntt is pursuing his claim of an interest in the lease in a separate suit. Matthews filed a motion for summary judgment in July, 1984. In October, 1984, Frost, in its amended answer, filed a counterclaim and crossclaim against Matthews and Gauntt, respectively, for tortious interference with a contract and conspiracy to tortiously interfere with a contract. Frost and Gauntt responded separately in opposition to Matthews's motion for summary judgment. Matthews and Gauntt each filed a motion for summary judgment on Frost's counterclaim and crossclaim, respectively. Frost responded to these motions for summary judgment on its counterclaim and crossclaim.

The trial court granted all motions for summary judgment. Frost and Gauntt appeal the granting of the summary judgment terminating the lease. Frost also appeals the granting of the motions for summary judgment on its counterclaim and crossclaim.

■ In reviewing summary judgment proceedings, the reviewing court applies the following rules: (1) the movant has the burden to show that there is no issue of material fact and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference is indulged in favor of nonmovants and doubts resolved in their favor. *Wilcox v. St. Mary's University of San Antonio*, 531 S.W.2d 589 (Tex.1975); Tex. R.Civ.P. 166–A.

Frost and Gauntt complain that the trial court erred in granting Matthews's motion for summary judgment which terminated the lease because there are disputed issues of material fact and because Matthews is not entitled to judgment as a matter of law.

The lease contained a *force majeure* clause which provided:

Should Lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or on land pooled therewith or from producing oil or gas therefrom or from land pooled therewith by reason of scarcity of or inability to obtain or to use equipment or material, or by operation of force majeure, any Federal or State law or any order, rule of regulation of governmental authority, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from

conducting drilling or reworking operations on or from producing oil or gas from the leased premises or land pooled therewith, and the time while Lessee is so prevented shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

Production of gas from the leased land stopped when the wells were shut-in on December 29, 1982. The wells were shut-in pursuant to orders of the Railroad Commission, which were issued because the previous operator had been producing gas without an assigned allowable from the Railroad Commission.

■ Cessation of production when wells are shut-in under orders of the Railroad Commission clearly comes within the language of the lease's *force majeure* provision. Under that provision, the lease shall be extended while and so long as the lessee is prevented by the order of a governmental authority from producing gas from the leased premises, anything in the lease to the contrary notwithstanding. The lease should not have been terminated under the *force majeure* clause.

The lease also contains a shut-in gas royalty provision which states:

[W]hile there is a gas well on this lease or on acreage pooled therewith, but gas is not being sold or used, Lessee may pay or tender as royalty on or before ninety (90) days after date on which (1) said well is shut in, or (2) this lease ceases to be otherwise maintained as provided herein, whichever is the later date, and thereafter at monthly intervals, the sum of Two Hundred Fifty and No/100 ($250.00) Dollars, per well and if such payment is made or tendered, this lease shall not terminate and it will be considered that gas is being produced from this lease in paying quantities; ....

Frost made the required shut-in gas royalty payments, although such payments do not appear to be necessary to avoid termination of the lease, which was extended under the *force majeure* clause. *See Skelly Oil Company v. Harris*, 163 Tex. 92, 352 S.W.2d 950 (1962).

■ The wells were shut-in on December 29, 1982. Under the shut-in royalty clause, the first payment was due 90 days later, on March 28, 1983, with subsequent payments being due on April 28 and May 28. Production of gas began again on June 23. Frost made the first shut-in royalty payment on January 26, 1983, approximately two months early. Frost made subsequent payments on March 3, March 29, April 29 and May 26, thus making all the required shut-in payments early, plus two additional unnecessary payments. The lease allows such early payment, providing:

The payment or tender of rental under this paragraph and of royalty under Paragraph 2 [which contains the shut-in gas royalty provision] on any gas well from which gas is not being sold or used may be made by the check or draft of Lessee mailed or delivered to the parties entitled thereto or to said bank on *or before* the date of payment. (emphasis added)

Frost having complied with the shut-in royalty requirements, the lease should not have been terminated under the shut-in royalty clause. The summary judgment terminating Frost's oil, gas and mineral lease cannot be upheld.

■ Frost also maintains that the trial court erred in granting Matthews's and Gauntt's motions for summary judgment on its counterclaim and crossclaim of tortious interference with a contract and civil conspiracy to tortiously interfere with a contract, because there are disputed issues of material fact. When the defendant moves for summary judgment, the opponent of the motion does not have the burden to establish that there is any issue of fact; the movant has the burden to conclusively negate the existence of one or more of the essential facts necessary to sustain the opponent's cause of action. *Kolb v. Texas Employers' Insurance Ass'n*, 585 S.W.2d 870 (Tex.Civ.App.-Texarkana 1979, writ ref'd n.r.e.). In addition, the court must accept as true all evidence which tends to support the opponent's conten-

tions, and must resolve in his favor all conflicts in his testimony or in other summary judgment evidence, giving him the benefit of all inferences reasonably deducible in his behalf. *Kolb v. Texas Employers' Insurance Ass'n, supra.* The summary judgments in favor of Matthews and Gauntt will be considered separately.

■■■■ Matthews and the other counterdefendants are parties to the lease. One cannot tortiously interfere with his own contract. Indeed, one is privileged to interfere with a contract of another if it is done in the bona fide exercise of his own rights or if he has an equal or superior right in the subject matter to that of the plaintiff, and this privilege extends to the actual assertion or threatened assertion of rights. *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105 (Tex.1984). The summary judgment in favor of Matthews on Frost's counterclaim of tortious interference is proper.

■■■■ Next we turn to the summary judgment in favor of Gauntt on Frost's crossclaim of tortious interference with a contract. To maintain an action for interference with a contract, it must be established that (1) there was a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred. *Armendariz v. Mora,* 553 S.W.2d 400 (Tex.Civ.App.-El Paso 1977, writ ref'd n.r.e.). There is a contract in this case—the oil, gas and mineral lease that is the subject of the main suit.

Gauntt filed an affidavit in connection with his motion for summary judgment on Frost's crossclaim. Among other things, he stated in the affidavit:

2. I have never entered into any plan or agreement with O.W. McCurdy, Jr., Robert S. Matthews, Sr., or any of the plaintiffs in this cause to induce the plaintiffs to undertake to break the Matthews Ranch Lease with Frost National Bank. In addition, I have never joined in any plan or agreement or had any tacit understanding to invade or interfere with Frost National Bank's

leasehold property rights in the Matthews Ranch Lease. I have also never had discussions on any such matters with O.W. McCurdy, Jr., Robert S. Matthews, Sr., or any of the plaintiffs.

. . . .

4. Moreover, I had no knowledge that plaintiffs in this cause were going to file suit to terminate the lease and never discussed the matter with them before their suit was filed on January 19, 1984. Moreover, I never discussed this matter with Robert S. Matthews, Sr.

A summary judgment may be based on uncontroverted testimonial evidence of an interested witness if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. Tex.R.Civ.P. 166–A.

■■■■ Gauntt's affidavit conclusively negates the second requirement of a cause of action for tortious interference with a contract, an act of interference. Gauntt was not one of the parties who filed suit seeking to terminate the lease; indeed, he intervened as a defendant in the suit seeking to uphold the lease. Frost did not produce evidence that Gauntt committed an act that wrongfully interfered with the lease. The summary judgment in favor of Gauntt on Frost's crossclaim of tortious interference with a contract is proper.

■■■■ An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey v. Armco Steel Co.* 652 S.W.2d 932 (Tex.1983).

■■■■ Gauntt's affidavit shows that he did not have a meeting of the minds with the other conspirators concerning the breaking of the lease. Also, Frost presented no evidence of any unlawful, overt acts

on the part of Gauntt to break the lease. At least two of the required elements of a civil conspiracy have been negated.

Frost did not present any evidence of any unlawful, overt acts by Matthews or any of the other counter-defendants, and they are all parties to the contract. The trial court properly granted the summary judgment in favor of Matthews and Gauntt on Frost's counterclaim and crossclaim of civil conspiracy to tortiously interfere with a contract.

We uphold the summary judgments granted in favor of Matthews and Gauntt on Frost's counterclaim and crossclaim of tortious interference with a contract and civil conspiracy to tortiously interfere with a contract. We reverse and remand to the trial court the summary judgment in the main suit in favor of Matthews which terminated Frost's oil, gas and mineral lease.