The CITIZENS NATIONAL BANK OF EMPORIA, KANSAS, et al., Appellants,

v.

SOCONY MOBIL OIL COMPANY, Inc., Appellee.

No. 7292.

Court of Civil Appeals of Texas.

Amarillo.

Nov. 4, 1963.

Rehearing Denied Dec. 2, 1963.

Gibson, Ochsner, Harlan, Kinney & Morris, Amarillo, for appellants.

Underwood, Wilson, Sutton, Heare & Berry, Amarillo, for appellee.

DENTON, Chief Justice.

This is a suit to determine the validity of an oil and gas lease on 9600 acres of land in Hemphill and Lipscomb Counties, Texas. All parties to this action filed motions for summary judgment. The trial court granted appellee's motion, overruled appellants' motion, and entered judgment for appellee and declared the lease in full force and effect.

The original land owners and leasors were Walter S. Jones and wife, Olive T. Jones, and the former's brother, Evan C. Jones, who was unmarried. On January 27, 1947, these leasors executed the lease in question to Earl Vandale. The lease, having a primary term of ten years, was subsequently assigned to Magnolia Petroleum Company, which was later succeeded by appellee, Socony Mobil Oil Company, Inc. Walter S. Jones died testate on January 25, 1953; Evan C. Jones died testate on September 8, 1953; and Olive T. Jones died intestate on November 1, 1957. The wills of Walter S. and Evan C. Jones were probated in Kansas and certified copies of such proceedings were filed in the appropriate Texas counties. Olive T. Jones' estate was administered in Kansas. L. P. Humphreys, Leo J. Brinkman and E. H. Rees were duly appointed executors and administrators of the three estates and continued to act as such until finally discharged by the Kansas probate court on February 7, 1962. Under the wills of Walter S. and Evan C. Jones all their land in Texas, including the land involved here, was left in trust to appellant, The Citizens National Bank of Emporia, Kansas, for charitable purposes, subject to a life estate to Olive T. Jones. On November 1, 1958, Frances C. Taylor and other heirs of Olive T. Jones initiated this suit in the District Court of Lipscomb County, Texas. This suit as originally initiated was in the nature of trespass to try title seeking to establish an undivided one-fourth interest in the Texas land. Other suits initiated by the same plaintiffs were filed in Kansas and Texas attacking the probate of the wills. In the present suit, the executors and administrators of the Jones' estates, the appellant bank and appellee oil company and others not material here were made party defendants.

It is undisputed the lease in question was kept in force and effect during the ten-year primary term by the payment of delay rentals to the depository bank, The First National Bank of Higgins, Texas. On January 11, 1957, some sixteen days prior to the expiration of the primary term, appellee commenced the drilling of an oil or gas well on the leased premises. Drilling was continued until the well was completed

as a gas well and shut in on September 19, 1957. On October 9, 1957, appellee commenced a second well which was completed as a gas well and shut in on January 20, 1958. In accordance with the lease provisions, appellee timely paid shut-in gas payments to the depository bank on September 26, 1957, and September 12, 1958. It is by virtue of these two shut-in payments that it is conceded by appellants that the oil and gas lease remained in force and effect until September 19, 1959. On August 31, 1959, appellee oil company filed its first amended answer, interpleader, and cross-action in the original suit filed by Frances C. Taylor and others. By this cross-action and interpleader appellee sought to have the lease declared in full force and effect, and asked that a determination be made as to the persons entitled to the shut-in payments, and that the funds so tendered be distributed to the parties entitled to the same. Simultaneously with the filing of the interpleader, appellee deposited into the registry of the court the shut-in gas payment of $9,600.00 which was admittedly payable on or before September 19, 1959. Subsequent annual shut-in payments have also been timely deposited into the registry of the court. On September 12, 1959, appellee commenced the drilling of a third well on the leased premises and continued operations until it was completed as an oil well on November 9, 1959. This well was immediately placed on production and has been producing oil in paying quantities since that time. The two gas wells previously brought in on September 19, 1957, and on January 20, 1958, for which shut-in payments had been paid as stated above, were placed on production on August 14, 1960, and have been producing gas in paying quantities ever since. On January 11, 1962, the claim of Frances C. Taylor and the other heirs were settled for a substantial sum and their cause of action was dismissed with prejudice, leaving appellee's cross-action and interpleader before the trial court for determination. In considering this later phase of the case, the trial court granted appellee's motion for summary judgment, from which this appeal was taken.

The two primary questions present here are whether appellee's interpleader and deposit of the shut-in payments into the registry of the court on August 31, 1959, constituted a tender or payment in accordance with the provisions of the lease; and whether the lease was kept in force and effect by the commencement of the third well of September 12, 1959, and completed as an oil well November 9, 1959. In considering both questions it is to be noted that appellants conceded the lease in question was in full force and effect until September 19, 1959.

Appellants contend: (1) That appellee had no right to interplead and deposit the shut-in gas payment into the registry of the court, and that it did not constitute a tender or payment in accordance with the terms of the oil and gas lease; and (2) The lease was not kept in force by the drilling of the third well commenced on September 12, 1959, because there was no actual production of oil and gas until after September 20, 1959.

The material portion of the paragraph 3 of the lease dealing with the shut-in payments reads as follows:

"(d) if at any time while there is a gas well or wells on the above land (and for the purposes of this clause (d) the term "gas well" shall include wells capable of producing natural gas, condensate, distillate or any gaseous substance and wells classified as gas wells by any governmental authority) such well or wells are shut in, and if this lease is not continued in force by some other provision hereof, then it shall nevertheless continue in force for a period of ninety (90) days from the date such well or wells are shut in, and before the expiration of any such ninety-day (90-day) period, lessee or any assignee hereunder may pay or tender an advance annual royalty

equal to the amount of delay rentals provided for in this lease for the acreage then held under this lease by the party making such payment or tender, and if such payment or tender is made, this lease shall continue in force and it shall be considered that gas is being produced from the leased premises in paying quantities within the meaning of paragraph 2 hereof for one (1) year from the date such well or wells are shut-in, and in like manner subsequent advance royalty payments may be made or tendered and this lease shall continue in force and it will be considered that gas is being produced from the leased premises in paying quantities within the meaning of said paragraph 2 during any annual period for which such royalty is so paid or tendered; such advance royalty may be paid or tendered in the same manner as provided herein for the payment or tender of delay rentals;"

By the terms of this paragraph, the parties agreed that "such advance royalty may be paid or tendered in the same manner as provided herein for the payment or tender of delay rentals". Delay rentals "may be made to the lessors or to The First National Bank of Higgins, Texas", thus, lessees had the option of paying or tendering the shut-in payments to either the lessors or the depository bank. This brings us to the question of whether or not appellee's interpleader and deposit of the shut-in payments into the registry of the court was in compliance with the terms of the lease.

Interpleader practice is governed by Rule 43, Texas Rules of Civil Procedure. This rule authorizes an interpleader suit only when persons having claims against a plaintiff are such that he "is or may be exposed to double or multiple liability". "A defendant exposed to similar liability may obtain such interpleader." The courts have uniformly held that for the remedy of interpleader to be proper the claim must be such as to place the stakeholder in some real doubt or hazard. Nixon v. Malone, 100 Tex. 250, 98 S.W. 380, 99 S.W. 403. Appellants rely on Davis v. East Texas Savings & Loan Association, 163 Tex. 361, 354 S.W.2d 926, in support of its contention appellee was not justified in filing the interpleader suit. That case involved an interpleader suit by the savings & loan association to determine, as between the widow and testator's daughter by a previous marriage, the correct distribution of funds held by the association. The court there held the interpleader suit was not proper on the ground Article 881a–23, Vernon's Ann.Tex. Civ.St., affords absolute immunity to a savings and loan association which pays such an account to one of the named share holders even after it has been notified of an adverse claim by the heirs of the other. The court held the association could have paid the deposit to the widow as a joint tenant with the rights of survivorship "without the slightest risk of double liability. The statute shielded it from risk with absolute immunity. There was, and is, no room for reasonable doubt of that fact." In our opinion the Davis case is distinguishable from the present case. The Davis case was not concerned with the question of whether or not the payment of the savings account fund into the registry of the court constituted a tender. The interpleader question dealt only with whether or not the association was entitled to recover attorneys' fees. In the case at bar, appellee is afforded no such absolute immunity even though the appellee could have paid or tendered the shut-in payments to the depository bank. The undisputed facts of the case do raise a reasonable doubt as to the ownership of the mineral interests here involved. Although the original trespass to try title case did not directly challenge the validity of the lease, it created a substantial doubt as to who owned the one-fourth interest in the mineral estate. The record shows this suit was compromised and settled upon the payment of $600,000.00 to Mrs. Taylor and the other claimants by the executors and administrators of the Jones' estates. This is an obvious indication of the validity of those claims. This

settlement, evidenced by a motion to dismiss the original suit dated December 15, 1961, and the order of dismissal filed January 11, 1962, took place over two years after the interpleader suit and deposit were made, was the culmination of eight pending lawsuits in Kansas and Texas attacking the wills and probate proceedings of the two estates. This series of lawsuits seeking to ascertain ownership to an undivided one-fourth of the mineral estate, created a confusing and uncertain situation. Under such circumstances, it is apparent corresponding doubt and uncertainty arose as to who was entitled to receive the shut-in payments.

Although no case has passed directly on this question dealing with the tender of the shut-in payment by an interpleader, the Galveston court in Perkins v. Magnolia Petroleum Co., Tex.Civ.App., 148 S.W.2d 266, (Error Dismissed, J. Cor.), used language that supports our conclusion here. The case was one in which Mr. Cannon acquired by inheritance a $\frac{7}{12}$ undivided interest in 1100 acres of land, and his sister, a Mrs. Howard, acquired $\frac{5}{12}$ in the same tract. Cannon's son claimed title to Mrs. Howard's interest by reason of a tax foreclosure and sheriff's deed. The two Cannons executed an oil and gas lease covering the 1100 to Corbett, and Corbett assigned the lease on the east 500 acres to Magnolia. After learning of the dispute between the Cannons and Mrs. Howard, Magnolia took another lease from Mrs. Howard as to her interest in the 500 acres. Both leases named the same depository bank. Prior to the anniversary date, Magnolia deposited a check for the delay rentals in the proper bank with instructions that it be deposited to the joint account of the Cannons and Mrs. Howard. The Cannons refused to accept the deposit as payment of the delay rentals and, thereafter, executed an oil and gas lease to Perkins which covered the same 500 acres. The court held the payment by the lessee into the joint depositories of the amount due was a sufficient compliance with the terms of the lease to prevent its cancellation, but went further and used the following language:

"Unquestionably, if appellee, instead of making a deposit with the joint depository agent named by the parties, had instituted an interpleader suit and had tendered the $500 payment for delay rentals into court to the account of the lessor entitled thereto, appellee would have been protected not only in the tender of said rental but in its expenses incurred therein."

Although the holding was not necessary for the disposition of the case and no authority is cited to support such language, we are of the opinion it reflects the correct rule under the facts and circumstances of the case at bar.

▆ The Supreme Court in Nixon v. Malone, supra, in discussing the remedy of interpleader, used the following language:

"The remedy of interpleader is an equitable one, and is for the protection of the disinterested and innocent stakeholder, who claims no interest in the money or property as a claimant or litigant, and who, by reason of the conflicting claims of persons who derive their title either from a common source or one from the other, and the uncertain and doubtful position in which he is placed by the diverse claimants, knows not what to do, and fears he may be hurt by some of them, asks instructions and protection from a court of equity." * * *

"While the circumstances of the case must be such as to place the stakeholder in some real doubt or hazard to entitle him to the remedy of interpleader, yet the remedy is so beneficial and so just that any reasonable doubt as to his right to an interpleader will be resolved in his favor."

We are convinced this rule is applicable to the facts and circumstances in the case at bar. We conclude, therefore, that ap-

pellee had a right and was entitled to file this interpleader suit and that by depositing the correct amount of shut-in payments into the registry of the court it was substantial compliance with the terms of the lease and·that it constituted a proper tender.

■ Although we are of the opinion appellee's interpleader was proper and his tender of the shut-in payment into the registry of the court was sufficient to keep the lease in force, we are also of the opinion the commencement of the third well on September 12, 1959, and its completion as a producing oil well on November 9, 1959, was in itself sufficient to keep the lease in force. In discussing this point, it will be presumed the tender into the registry of the court was improper.

As previously stated, it is conceded the lease was extended beyond the primary term by the lessee's payment of two shut-in payments. Thus, all parties agree the lease was in force and effect until September 19, 1959. The question presented by this point of error must be determined by the express terms of the lease. The provisions of the present lease are substantially the same as those found in Skelly Oil Co. v. Harris, 163 Tex. 92, 352 S.W.2d 950, and in Stanolind Oil & Gas v. Newman Brothers, 157 Tex. 489, 305 S.W.2d 169.

The third well was commenced at a time when the lease was in force by virtue of the fact there was constructive production on the leased premises. Paragraph 3(d) of the lease provides:

"* * * if such payment (referring to shut-in payments) or tender is made, this lease shall continue in force and it shall be considered that gas is being produced from the leased premises in

paying quantities within the meaning of paragraph 2 hereof * * *."

Paragraph 2 is the usual habendum clause which provides that the lease should remain in force for ten years and as long thereafter as oil, gas or other mineral is produced from the leased land. Thus, it is clear the lease provided that while the shut-in payments are being paid, the well shall be considered a producer under paragraph 2. If the shut-in payment was not paid on or before the anniversary date, gas was not being produced from the premises on that date, and the lease would thereby terminate for nonproduction in the absence of other clauses in the lease which would extend it. Freeman v. Magnolia Petroleum Company, 141 Tex. 274, 171 S.W.2d 339.

It is appellants' position that in order for this third well to extend the lease, it must be a producing well prior to September 20, 1959. Under the facts and terms of this lease we are unable to agree. Appellant further strongly relies on Gulf Oil Corp. v. Reid, 161 Tex. 51, 337 S.W.2d 267, for the contention the sixty-day clause did not come into place because there was no production hence there could be no cessation of production. We think the same differences which exist in the lease in the Reid case and the Harris case, as pointed out in the latter, are evident in the present case.

In construing a similar sixty-day clause in the Harris case, Justice Walker said:

"Paragraph 6 of the lease in the present case does not deal merely with cessation of production or the completion of a dry hole after expiration of the primary term. The third sentence (which is substantially the same as the second sentence in the present lease [1]) comes

1. "(6) If, prior to discovery of oil, gas, or other minerals on said land or on land pooled therewith, lessee should drill and abandon a dry hole or holes thereon, or if, after discovery of oil, gas or other minerals, the production thereof should cease from any cause, this lease shall not terminate if lessee commences addi-

tional drilling or reworking operations within sixty (60) days thereafter, or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion and abandonment of said dry hole or holes

into play when there is no production at the end of the primary term but drilling or reworking operations are then in progress."

Assuming, arguendo, that the shut-in payment deposited into the registry of the court was not an effective payment of the advance royalty, the lease would have terminated on September 19, 1959, if the sixty-day clause did not come into operation. In both the Harris case and the present one drilling operations were begun at a time when the lease was in force. In the Harris case drilling was begun just prior to the end of the primary term, while in this case drilling operations were begun just prior to the end of the extended term of the lease. We do not consider this a material legal distinction. Under the language of the Freeman case, gas was not being produced at the end of the extended term upon the failure to pay or tender the advance royalty. We think the holding of the Harris case is controlling here. In as much as drilling operations were in progress when there was no production at the end of the extended term the sixty-day clause is brought into operation.

The shut-in royalty clause does not provide for an exclusive method for continuing the lease in effect even though a producing well has been completed and capped. Here the lessee chose to commence drilling operations for the third time and completed a producing well within the clear meaning of the sixty-day clause. The unambiguous language of this clause provides that if such operations result in production when there has been no cessation of more than sixty consecutive days, the lease remains in force so long as production continues. It is undisputed these requirements have been complied with.

---

or the cessation of production. If, at the expiration of the primary term, oil, gas, or other mineral is not being produced on said land or land pooled therewith but lessee is then engaged in operations for drilling, mining or reworking of any well or mine thereon, this lease shall remain in force so long as such operations or said

As the requirements of the sixty-day clause were fully complied with, the lease will remain in full force and effect so long as oil, gas or other mineral is produced from the leased premises. See also Duke v. Sun Oil Co., 320 F.2d 853, (Fifth Circuit).

The judgment of the trial court is affirmed.

Affirmed.

---

additional operations are commenced and prosecuted (whether on the same or successive wells) with no cessation of more than sixty (60) consecutive days, and, if they result in production, so long thereafter as oil, gas or other mineral is produced from said land or land pooled therewith. * * * "