**COPELCO LEASING CORP.,**
**Plaintiff–Appellant,**
**Cross–Appellee,**

v.

**DIAGNOSTIC IMAGING SERVICES**
**OF ST. TAMMANY, INC.,**
**Defendant–Appellee, Cross–Appellant,**

**and**

**Charles E. Baier, M.D., et al.,**
**Defendants–Appellees.**

**No. 88–3919.**

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1989.

---

Marie Breaux Stroud, William R. Pitts, Richard E. Anderson, Liskow & Lewis, New Orleans, La., for plaintiff-appellant, cross-appellee.

Nathan T. Gisclair, Jr., A. Albert Ajubita, David W. O'Quinn, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for defendant-appellee, cross-appellant.

Before CLARK, Chief Judge, GEE and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this breach of contract diversity case, lessees Diagnostic Imaging Services of St. Tammany, Inc. and Charles E. Baier, M.D., et al., appeal a grant of summary judgment holding that they breached their lease by failing to pay lease taxes. The lessor, Copelco Leasing Corporation, cross-appeals the district court's refusal to award it costs, interest and attorney's fees. Because the plain terms of the lease obligated the defendants to pay lease taxes, we hold that their belated payments into a court registry did not relieve them of the consequences of default, and imposed upon them the costs of collection, including attorney's fees, as set forth in the lease.

## I

On November 8, 1984 the plaintiff, Copelco Leasing Corporation ("Copelco"), a New Jersey Corporation, leased a thirty-three-foot mobile x-ray vehicle to Diagnostic Imaging Systems of St. Tammany ("Diagnostic"), a Louisiana medical partnership. The five-year lease was to begin February 1, 1985 and provided for a monthly rental of $7,500. This rent was based on an "estimated cost," for the vehicle's purchase and delivery to Diagnostic, of $359,000. The lease included a provision permitting the upward adjustment of the rent if the actual cost exceeded the estimated cost by less than ten percent. If the actual cost exceeded the estimated cost by more than ten percent, Copelco was to notify Diagnostic in writing and allow it fifteen days to cancel the lease.[1]

Copelco's obligation under the lease was to obtain the vehicle and deliver it to Diagnostic. Diagnostic was then to assume all operating expenses and make rental payments to Copelco. The lease read as a "net lease," which put responsibility for taxes and other incidental expenses on the lessee.[2]

Almost immediately a dispute arose concerning responsibility for state and parish lease taxes, which were then $450 a month. In January, 1985, Copelco sent Diagnostic an invoice for rent of $7,500 and state and parish lease taxes of $450. Diagnostic claimed that it had entered a lease-purchase agreement, under which it was responsible for sales tax and licensing of the vehicle but not lease taxes. It paid only the $7,500 in rent. Copelco claimed that the agreement was an ordinary lease which put the responsibility for all taxes (except income taxes on the lease payments) on Diagnostic.

Copelco initially paid the lease taxes in order to avoid penalties. It then sent Diagnostic several letters concerning the lease taxes, including a certified letter on December 31, 1985 that formally demanded payment of the lease taxes, refused to accept Diagnostic's several asserted bases for denial and stated that failure to pay the taxes would constitute default under the terms of the lease. Diagnostic finally began paying lease taxes in August 1986, eighteen months after Copelco's initial demand. In December 1986 the parish tax rate rose by two percent to $600 a month. Diagnostic continued to pay only $450 a month in lease taxes to Copelco until September 1987, when it sent Copelco a written notice of termination.

Diagnostic then sought a state declaratory judgment action that it had properly

1. The provision, Paragraph Two (E), stated:

   As used herein, "actual cost" means the cost to Lessor of purchasing and delivering the Equipment to Lessee, including taxes, transportation and other charges. The amount of each Rental Payment and the Security Deposit set forth in the Schedule are based on the total cost set forth in Lessor's Purchase Order ("estimated cost"), which is an estimate and shall be adjusted proportionately if the actual cost of the Equipment is greater than said estimate. Lessee hereby authorizes Lessor to adjust upward the amounts set forth in the schedule when the actual cost is known and to add to the amount of each Rental Payment any sale, use, or leasing tax that may be imposed on or measured by the Rental Payments. Lessor will inform lessee of the adjustments necessary to reflect actual cost. If the actual cost of the Equipment on any schedule exceeds the estimated cost by more than ten (10%) percent thereof (exclusive of taxes), Lessor shall, if it desires to add to the estimated cost an amount in excess of ten (10%) percent of the estimated cost, so notify

the Lessee in writing. Within fifteen (15) days thereafter, Lessee at its option may terminate the term of the relevant schedule by giving notice to Lessor of its intention to do so, effective the day of such notice, subject however to the provisions of Section 2G hereof.

2. Paragraph Six of the lease provided:

   TAXES AND CHARGES. THIS LEASE IS INTENDED TO BE A NET LEASE AND ALL PAYMENTS HEREUNDER ARE INTENDED TO BE NET TO LESSOR TO THE EXTENT PERMITTED BY APPLICABLE LAW. Lessee shall pay directly ... all license fees, assessments, and other governmental charges, and all sales, use, excise, franchise, personal property and any other similar tax or taxes ... now or hereafter imposed, levied or assessed by any state, federal or local government or agency upon any of the Equipment or upon the leasing, purchase, ownership, use, possession, financing or operation thereof, or upon the receipt of Rental Payments therefor, or arising therefrom....

terminated the lease. It deposited the disputed funds for back taxes and interest into the court registry, and continued to pay rent of $7,500 and lease taxes into the registry thereafter. Diagnostic denied any liability to Copelco and sought return of the money in the registry. Copelco brought suit in federal court, seeking damages provided for under the lease. The state court action was dismissed by agreement of the parties in order to pursue the federal suit.

On cross-motions for summary judgment, the district court found that Diagnostic was liable for the lease taxes and could not terminate the lease under the cancellation provision of paragraph Two (E). It held that lease taxes were not an "actual cost" that could trigger this provision, and that even if they were, Diagnostic's notice of cancellation was not timely because the initial demand for back taxes had been made in December 1985. The court denied, however, Copelco's demand for attorney's fees, acceleration and costs, holding that Diagnostic had constructively paid the money Copelco had demanded by depositing it in the court registry, from which Copelco could have removed it by "simple motion." Both parties have appealed all issues except the denial of acceleration.

## II

As is apparent from the foregoing, this case centers on a dispute concerning responsibility for lease taxes. Diagnostic contends that it did not bargain to pay lease taxes, so when Copelco demanded payment of them, its rent "unexpectedly" increased. Diagnostic sought to avoid this "increase" by cancelling the lease and argues that the large size of the increase entitles it, under a cancellation provision, to do so. To determine Diagnostic's rights to terminate the agreement unilaterally, we must first identify which party bears responsibility for the lease taxes.

### A

▇ The responsibility for all taxes, including lease taxes, is set forth in the lease itself. Paragraph Six

provides:

> Lessee shall pay directly ... all sales, use, excise, franchise, personal property and any other similar tax or taxes ... now or hereafter imposed, levied or assessed by any state, federal or local government or agency ... upon any of the Equipment or upon the leasing, purchase, ownership, use, possession, financing or operation thereof, or upon the receipt of Rental Payments therefor....

The district court found that this provision made Diagnostic liable for the lease taxes. Diagnostic did not, and does not now, directly challenge this conclusion. Instead, it claims that Copelco's actions during the lease period have somehow modified the lease's terms, waived the lessor's rights or forgiven claims to the amounts owing. We disagree, but we need not address these claims because Diagnostic did not raise them below. "Absent special circumstances, this Court will not hear issues not raised in or decided by the district court." *C.A.T. Indus. Disposal v. Browning Ferris*, 884 F.2d 209, 210–11 n. 3 (5th Cir.1989) (citing *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)). Diagnostic states simply that not considering these arguments now would result in a "miscarriage of justice." We think this rather overstates the matter and dismiss Diagnostic's claims that the lease terms have been modified or waived, or its obligations to pay lease taxes forgiven.

### B

Diagnostic next argues that even if the terms of the agreement made it liable for the lease taxes, it no longer has any such obligation because it exercised its right to cancel the agreement unilaterally. The lessee's power to cancel the lease is set forth in paragraph Two (E) of the lease.[3] This paragraph gives the lessor authorization to increase the rent if the "actual cost" exceeds the "estimated cost." The lessor, however, must inform the lessee in writing

3. See note 2 above.

if the increase exceeds ten percent, and the lessee then has fifteen days to terminate the lease.

The lease agreement was negotiated and executed before the vehicle was purchased and delivered by Copelco. Paragraph Two (E) allocates the risk of changes in costs between Copelco and Diagnostic over the period until the leased vehicle is delivered to Diagnostic. Copelco agrees to accept the risk of cancellation should its costs of "purchasing, and delivering the Equipment to [Diagnostic], including taxes, transportation and other charges" exceed its estimate by more than ten percent; Diagnostic agrees to accept the risk of an unavoidable rent increase should these costs exceed Copelco's estimate by less than ten percent. "Actual cost" thus includes the costs of putting the equipment in the hands of the lessor. Once this is done, "Lessee hereby authorizes Lessor to adjust upward the amounts set forth in the schedule when the actual cost is known and to add to the amount of each Rental Payment any sales, use, or leasing tax that may be imposed on or measured by the Rental Payments." The "actual cost," as this sentence indicates, is to be finally calculated when delivery of the equipment is made. Taxes that accrue in proportion to the rental payments are simply to be added to the rent due, whatever the rent may be after it has been adjusted by the variance between actual and estimated cost.

■ This reading of Paragraph Two (E) makes it comport with Paragraph Six. Under Paragraph Six, all taxes were to be borne by Diagnostic. Those that accrued before the equipment was delivered were part of the ten percent allowance for increased actual costs under Paragraph Two (E). Upon delivery, the actual cost was computed and the rent adjusted. When this computation was made, there was no variation between the actual and the estimated cost. Thereafter, as set forth in Paragraph Six, the cost of lease taxes, it was agreed, were to be added to the rent. Consequently, Diagnostic was not entitled to unilaterally cancel the lease agreement under Paragraph Two (E).

This is the way that the district court read the lease and we cannot fault it. Moreover, as the district court found, even if the request for lease taxes was an increase exceeding ten percent of estimated cost, the time for Diagnostic to exercise its cancellation rights was within fifteen days of its written notification of the increase. It received notification of this "increase" by invoice in January of 1985. After Diagnostic initially refused to pay the lease taxes, it consulted with state tax authorities who provided it with actual knowledge that it owed the taxes. It received a formal demand for payment of the taxes in December 1985. Diagnostic's notice of cancellation on September 15, 1987 was thus untimely under the contract.

## C

■ Copelco challenges the district court's holding that Diagnostic's actions did not amount to default because its deposits in the court registry constituted "constructive payment." Copelco argues that Diagnostic's failure to reimburse it for lease taxes was default under the lease and entitled it to recovery of costs, interest, and attorney's fees, both as provided for in the lease and by law. We need not determine whether Copelco was entitled to these remedies as a matter of law, however, because we hold that the clear terms of the contract entitle Copelco to these remedies.

The lease defines actions that will give rise to default. Paragraph Ten (A) of the lease states: "If (a) Lessee shall fail to pay any rental payment, service charge or late charge on any arrearage or any other payment hereunder within five (5) days after the date when such obligation is due; ... then, in any such event, the Lessee shall be deemed to have breached this lease and shall be in default hereunder." The lease also provides that the lessee shall reimburse the lessor for the costs of noncompliance. Paragraph Two (C) states: "If Lessor is subject to any expense by reason of noncompliance by Lessee with any provision of this lease, the amount of such expense and Lessor's reasonable attorney's fees and expenses shall be added to and

paid by Lessee with the next or any subsequent rental payment due hereunder." Under these provisions, Diagnostic's failure to pay lease taxes entitles Copelco to interest, costs and attorney's fees.

 The question remaining, however, is whether Diagnostic's payments to the court registry changed its obligations under these provisions of that lease. First, we note that Diagnostic's deposits into the registry did not amount to tender and deposit in satisfaction of a debt. The provisions for tender and deposit are set forth in La.Civ.Code arts. 1869–1872. Diagnostic has not argued, for example, that it tendered Copelco payment for the taxes and that Copelco refused to accept it. Furthermore, in order to make deposit with a court registry effective for discharge after refusal by a creditor, "tender must be unconditional, that is, it cannot be predicated upon the creditor's surrendering a potential legal right to a greater amount in order to accept the amount offered." *Walker v. Investment Properties Ltd.*, 507 So.2d 850, 852 (La.App.1987).

Here, tender was not unconditional; Diagnostic contended that Copelco was not entitled to reimbursement for the lease taxes. Throughout this dispute, Diagnostic retained possession of the leased property. We think it can hardly be said that, without the benefit either of its property or payments clearly due it under the lease, Copelco constructively received anything. We thus find that Copelco is entitled to the remedies provided in the lease for default, including costs, interest, late charges and attorney's fees.

### III

For the foregoing reasons, the judgment of the district court granting Copelco summary judgment is AFFIRMED, the denial of Copelco's claim for attorney's fees, costs interest and late charges is REVERSED, and the case is REMANDED for determination of and entry of a judgment for attorney's fees.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.