PETRO SOURCE PARTNERS, LTD.
and Petro Source Corporation,
Appellants,

v.

3–B RATTLESNAKE REFINING
(1990), LTD., Appellee.

No. 08–93–00225–CV.

Court of Appeals of Texas,
El Paso.

Aug. 10, 1995.

Rehearing Overruled Sept. 13, 1995.

Katherine L. Dodds, Houston, William W. Clifton, Jr., Boldrick, Clifton, Nelson & Holland, Midland, Jennifer Bruch Hogan, Holman Hogan Dubose & Townsend, L.L.P., Houston, for appellants.

L. Randall Lee, Richard, Lee, Rowley, Cobb & Hall, El Paso, Hon. Robert K. Whitt, Midland, for appellee.

Before BARAJAS, C.J., and KOEHLER and LARSEN, JJ.

## OPINION

LARSEN, Justice.

Appellee, 3–B Rattlesnake Refining (1990), Ltd. (Rattlesnake), sued Appellants, Petro Source Partners Ltd. and Petro Source Corporation (Petro Source) for breach of an oral contract, fraud, tortious interference with a contract, and breach of the duty of good faith and fair dealing. Petro Source counterclaimed against Rattlesnake for fraud. Trial was to a jury. The jury found all claims in favor of Rattlesnake and awarded $245,-823.84 in actual damages and $750,000 in

exemplary damages against Petro Source. We reverse and render.

### FACTUAL BACKGROUND

During late May or early June of 1992, Bill Watson (Watson), owner of Rattlesnake, called Tom Brown (Brown), the local general manager of Petro Source, in an attempt to sell approximately 12,000 barrels of crude oil. Due to financial difficulties, Rattlesnake was unable to operate its refinery. Rattlesnake needed to sell the crude oil it had on hand in order to raise operating cash and to pay existing creditors. Brown and Watson reached a tentative agreement for Petro Source's purchase of the oil. Petro Source's legal department refused to approve the deal because of a possible bulk transfer problem [1] and an outstanding federal tax lien on all of Rattlesnake's property. Brown and Watson continued negotiating in hopes of finding a mutually acceptable solution to the title problems. The parties decided to bring Sandhills Petroleum, Inc. (Sandhills) into the transaction. Rattlesnake was to sell the oil to Sandhills and Sandhills would then sell the oil to Petro Source.

The purpose of running the transaction through Sandhills is the crux of this lawsuit. At trial, Watson first testified that Brown orally represented that if Rattlesnake ran the oil transaction through Sandhills, Rattlesnake would be promptly paid regardless of any title problems. Later, Watson essentially recanted and admitted that no one at Petro Source ever explicitly represented that Rattlesnake would be paid regardless of whether Rattlesnake conveyed clear title to the oil. Watson continued to maintain, however, that Petro Source represented by omission that it would pay Rattlesnake through Sandhills regardless of liens on the oil because Petro Source knew about the title problems, but allegedly failed to state that it would not pay for the oil if Sandhills was unable to deliver clear title. Rattlesnake contended at trial that this representation constitutes an oral contract between it and Petro Source which Petro Source breached by failing to pay Rattlesnake through Sandhills in spite of existing liens in the oil. Rattlesnake also based its fraud and good faith and fair dealing claims on Petro Source's alleged failure to follow through on this same representation. Petro Source, on the other hand, asserted that both parties understood that Sandhills' purpose was to work with Rattlesnake to clear the title problems. Brown testified that Petro Source never represented, nor did it ever intend, that it would pay Rattlesnake for the oil unless Sandhills and Rattlesnake were able to clear the title problems.

On July 7, 1992, Rattlesnake and Sandhills signed a written contract for sale of the oil from Rattlesnake to Sandhills. The contract made Sandhills' duty to pay Rattlesnake dependent upon Sandhills' receipt of payment from Petro Source. The Sandhills/Rattlesnake contract also required Rattlesnake to warrant title to oil delivered pursuant to the contract. Sandhills and Petro Source entered into a written contract dated August 12, 1992 for the sale of the oil from Sandhills to Petro Source. The Sandhills/Petro Source contract required Sandhills to warrant title to the oil. By the end of July, the oil was delivered through Sandhills to Petro Source.

On July 28, 1992, James Burke, a Vice President of Petro Source, sent a letter to Dennis Dickerson, President of Sandhills, stating that Petro Source could not pay Sandhills for the oil until Sandhills obtained a bulk sale certificate from Rattlesnake. The certificate Petro Source requested provided that the IRS and certain other of Rattlesnake's known creditors were aware of and consented to the sale. The certificate further provided that Rattlesnake had no secured or unsecured creditors other than those listed on the certificate. Watson signed but did not return the certificate, stating that the representations in the certificate would be false because the listed creditors had not consented and because Rattlesnake had various unsecured creditors who were not listed on the certificate. Apparently relying on the title requirements in the

1. See former Tex.Bus. & Com.Code Ann. § 6.101 et seq., repealed by Acts 1993, 73rd Leg., ch. 570, § 16, eff. Sept. 1, 1993. All acts relevant to this lawsuit occurred during 1992, prior to the effective date of the repeal.

**374**

written contracts, Petro Source had already sold the oil and found itself in possession of the proceeds from the sale of potentially encumbered oil.

After demand by Sandhills, Petro Source and Sandhills settled their contract. Petro Source paid Sandhills for the trucking charges Sandhills had incurred as part of the transaction, and for the profit Sandhills would have realized had the transaction been completed. Having thus satisfied Sandhills and taken it out of the transaction, Petro Source and Rattlesnake began to negotiate directly on about August 11, 1992 when Rattlesnake's attorney demanded payment for the oil from Petro Source. Petro Source refused to make payment to Rattlesnake without satisfactory proof of clear title. On August 13, 1992, Katherine Dodds, an attorney in Petro Source's legal department, faxed a letter to Rattlesnake's attorney offering Rattlesnake six options to resolve the dispute, including interpleading the disputed funds into the registry of the court or arranging to pay Rattlesnake's creditors directly. Rattlesnake refused all proposals and continued to insist on direct payment or return of the oil.

On August 14, 1992, the day after Petro Source's offer of the six options, Rattlesnake filed its lawsuit against Petro Source for breach of contract, fraud, conversion, tortious interference with contract, and breach of the duty of good faith and fair dealing. Rattlesnake later dropped its conversion claim. Rattlesnake did not serve Petro Source until September 11, 1992. On October 2, 1992, Petro Source timely filed its answer in the original suit, and simultaneously filed a separate interpleader action paying $219,145.37 into the registry of the court. The $219,-145.37 represented Petro Source's calculation of the funds that would have gone to Rattlesnake on the Rattlesnake/Sandhills contract. Petro Source named Rattlesnake, the IRS, and all other creditors of Rattlesnake as parties and potential claimants. The IRS removed Petro Source's interpleader suit to federal district court. Petro Source filed a

plea in abatement in this suit requesting an abatement until the federal district court determined the interpleader issues. The trial court refused to abate this action.

Meanwhile, Rattlesnake took no part in the interpleader action and even stipulated in this lawsuit that Petro Source was entitled to a credit in the amount of the interpleaded funds against any judgment Rattlesnake obtained against Petro Source, yet Rattlesnake continued this lawsuit against Petro Source involving the very same funds. See *Petro Source Partners, Ltd. v. 3–B Rattlesnake Refining (1990) Ltd.,* 827 F.Supp. 1265, 1267 (W.D.Tex.1993). This lawsuit was tried to a jury verdict before the federal district court disposed of Petro Source's interpleader action.

### DISCUSSION

Petro Source challenges the jury verdict by nine points of error. Of particular importance to this appeal are Points of Error Two, Seven, and Eight, which, in various forms, challenge the trial court's refusal to allow Petro Source to claim the interpleader as an affirmative defense to any of Rattlesnake's claims. Rattlesnake counters that Petro Source failed to request appropriate jury questions and instructions on its various interpleader-based affirmative defenses and thereby waived its right to assert the defenses on appeal.[2] We disagree, finding that Petro Source pleaded interpleader as an affirmative defense to all of Rattlesnake's claims and that the evidence at trial conclusively established Petro Source's right to interplead the funds as payment. See TEX. R.CIV.P. 279.

This case is somewhat complicated by the fact that Petro Source chose to file its interpleader action in a separate cause rather than as part of its answer to Rattlesnake's lawsuit. Further confusion results from the IRS's removal of the interpleader action to federal district court and the fact that this cause went to a jury verdict before the federal district court disposed of the interpleader action. The fact that Petro Source inter-

2. The trial court instructed the jury that the interpleader "is not payment or performance of an agreement, if any, between Petro Source and Rattlesnake." Petro Source objected to the instruction and complains of its inclusion in the charge in Point of Error Eight.

pleaded the funds and pleaded the interpleader as a defense in this lawsuit, however, is undisputed.

### Effect of Interpleader

■ Rule 43 of the Texas Rules of Civil Procedure authorizes a defendant who receives multiple claims to property in its possession to join all claimants in one lawsuit and deposit the disputed property into the registry of the court. Tex.R.Civ.P. 43. The purpose of interpleader is to allow an innocent stakeholder facing rival claims to let the courts decide who is entitled to the fund and thus avoid the peril of acting as judge and jury itself and relieve itself of the vexation and expense of multiple litigation and the risk of multiple liability. *Olmos v. Pecan Grove Mun. Utility Dist.*, 857 S.W.2d 734, 741 (Tex.App.—Houston [14th Dist.] 1993, no writ); *Dallas Bank and Trust Co. v. Commonwealth Development Corp.*, 686 S.W.2d 226, 230 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). A party faced with competing claims obtains a discharge of liability to the competing claimants by interpleading the funds. *Citizens National Bank of Emporia v. Socony Mobil Oil Co., Inc.*, 372 S.W.2d 718, 722 (Tex.Civ.App.—Amarillo 1963, writ ref'd n.r.e.).

### Petro Source's Burden of Proof

■ An interpleading party is entitled to relief after establishing that the party: (1) is either subject to, or has reasonable grounds to anticipate, rival claims to the same fund or property; (2) has not unreasonably delayed filing his action for interpleader; and (3) has unconditionally tendered the fund or property into the registry of the court. *Olmos*, 857 S.W.2d at 741; *Savings & Profit Sharing Fund of Sears Employees v. Stubbs*, 734 S.W.2d 76, 79 (Tex.App.—Austin 1987, no writ). Every reasonable doubt should be resolved in favor of the putative stakeholder's right to interplead. *Socony*, 372 S.W.2d at 722. In this case, the evidence at trial conclusively established each of the required elements in Petro Source's favor. We will address each element separately below.

### A. Reasonable Grounds to Anticipate Rival Claims

■ Petro Source was aware of the IRS lien, and of numerous other creditors of Rattlesnake, prior to the attempted direct Rattlesnake/Petro Source deal. In fact, it is undisputed that potential title problems were the reason Petro Source refused the initial deal. Petro Source, through its agents, testified that it anticipated rival claims both from potential unsecured creditors under the Bulk Sales Act and from the IRS.

### 1. Bulk Transfer Act

■ For purposes of this appeal, we need not determine whether the Bulk Transfer Act would have applied to this transaction. We need only determine whether Petro Source's anticipation that the Act would apply was reasonable. See *Olmos*, 857 S.W.2d at 741 (party must have "reasonable grounds to anticipate" rival claims). Petro Source was not required to speculate at its peril as to the ultimate decision in the judicial process. See *MCZ, Inc. v. Triolo*, 708 S.W.2d 49, 57 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Parker Square State Bank v. Triangle Supply Co.*, 364 S.W.2d 418, 424 (Tex.Civ.App.—Eastland 1963, writ ref'd n.r.e.).

■ The Act, formerly Texas Business & Commerce Code, Section 6.101 et seq., now repealed (see footnote one), was designed to protect unsecured creditors from fraudulent dispositions of their debtor's inventory. The Act applied to any enterprise "whose principal business is the sale of merchandise from stock, including those who manufacture what they sell." Tex.Bus. & Com.Code Ann. § 6.102(c) (Vernon 1968). The sale by a covered enterprise of a major part of its inventory outside the ordinary course of its business constitutes a bulk transfer under the Act. Tex.Bus. & Com.Code Ann. § 6.102(a)(Vernon 1968). See *Bergen, Johnson & Olson v. Verco Mfg. Co.*, 690 S.W.2d 115, 118–19 (Tex.App.—El Paso 1985, writ ref'd n.r.e.). "Inventory" includes goods, raw materials, work in process or materials used or consumed in a business. Tex.Bus. & Com. Code Ann. § 9.109(4)(Vernon 1991).

Given the statutory definitions, it was not unreasonable for Petro Source to have concern that the transaction might come under the Act. Rattlesnake's business is refining crude oil and selling the refined oil. Thus, Rattlesnake might reasonably be interpreted to be a seller of merchandise it had manufactured. The crude oil could reasonably fit the definition of raw material, work in process, or material used or consumed in Rattlesnake's oil refining business and thus be considered "inventory" under the Act. The oil in question constituted 100 percent of unrefined oil on hand at Rattlesnake's refinery. It was Petro Source's understanding that the crude was virtually all of the petroleum product of any kind, refined or unrefined, Rattlesnake had on hand at the refinery. It therefore represented "a major part" of "inventory." The sale of almost 100 percent of its unrefined oil, as opposed to refined diesel or gasoline, could reasonably be interpreted to be outside the regular course of the business of a refinery. Thus, we find that Petro Source reasonably concluded that the transaction in question might be a sale by a covered enterprise of a major part of its inventory outside the ordinary course of its business and therefore constitute a bulk transfer.

We must further determine whether Petro Source reasonably anticipated a claim to the contract funds resulting from the purported bulk sale. Petro Source had requested a bulk sale certificate from Rattlesnake prior to making payment on the Sandhills contract. Watson admitted that Rattlesnake refused Petro Source's request because Rattlesnake could not truthfully represent that all of Rattlesnake's creditors were either paid or consented to the sale. Petro Source was therefore aware of the possibility of unsecured creditors who could be potential claimants under the Act.

■■■ The Act and the case law interpreting it placed a high burden on transferees receiving property under a bulk transfer. Such a transferee had a "duty . . . to assure that . . . [the] consideration is applied so far as necessary to . . . debts of the transferor . . . ." Tex.Bus. & Com.Code Ann. § 6.106 (Vernon 1968). Transferees were bound to

"guarantee that the consideration paid for the assets of the transferor will be used to satisfy the transferor's debts" and required "to apply the proceeds to the debts of his transferor." *Rome Industries, Inc. v. Intsel Southwest,* 683 S.W.2d 777, 780 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Transferees were deemed a trustee or receiver and were "bound to see that the property, or its value, is applied to the satisfaction of claims of the creditors of the seller." *Anderson & Clayton, Co. v. Earnest,* 610 S.W.2d 846, 848 (Tex.Civ.App.—Amarillo 1980, no writ). These duties extended not only to a direct transferee, but also to subsequent transferees with notice of the defect. See Tex.Bus. & Com.Code Ann. § 6.110 (Vernon 1968). Petro Source, having gained knowledge of the defect when Rattlesnake admitted that it could not truthfully provide a bulk transfer certificate, reasonably anticipated that it might be subject to the duties of a transferee.

As stated earlier, we need not decide whether the Act applied to this transaction. Rather, we merely determine whether Petro Source's anticipation of a claim under the Act was reasonable. Under these facts, Petro Source had a reasonable basis to anticipate that the transfer constituted a bulk sale and that creditors of Rattlesnake might assert a claim to the proceeds pursuant to the Act. Further, by interpleading the funds, Petro Source was not only protecting itself, but also responding to its perceived legal duty under the Act to act as trustee for Rattlesnake's unsecured creditors.

### 2. Federal Tax Lien

■■■ Petro Source knew of an existing IRS federal tax lien in an amount greater than the contract price of the oil covering all property and rights to property belonging to Rattlesnake. Federal case law holds that transfer of property subsequent to the attachment of a tax lien does not affect the lien, for it is the very nature and essence of a lien that no matter into whose hands the property goes, the lien follows. IRS tax liens remain attached to a taxpayer's property even when it is transferred to another innocent party. *United States v. Bess,* 357

U.S. 51, 57, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135, 1141–42 (1958).

Significantly, after trial of this case, the federal district court awarded summary judgment to the IRS in Petro Source's interpleader action, finding that the tax liens extended to the proceeds from the sale of the oil interpleaded by Petro Source as a matter of law. See *Petro Source*, 827 F.Supp. at 1269. On these facts, we find that Petro Source had reasonable grounds to anticipate an IRS claim to the contract funds.

In light of the facts known to Petro Source combined with the applicable federal tax and state bulk transfer law, we find Petro Source's anticipation of rival claims to the contract proceeds was reasonable.

**B. No Unreasonable Delay**

■ Petro Source did not interplead the disputed funds until October 2, 1992, seven weeks after Rattlesnake filed its suit. Rattlesnake argues that this delay was unreasonable. The record reflects, however, that Petro Source offered to settle the dispute on August 13 by filing an interpleader. This offer appears to have come about two days after Rattlesnake first demanded payment directly from Petro Source. Rattlesnake's response was to file suit the next day. Rattlesnake failed to serve Petro Source with the suit until September 11, 1992. Petro Source timely answered Rattlesnake's lawsuit and simultaneously filed the separate interpleader action. Petro Source pleaded the interpleader action as a defense to Rattlesnake's claims. Interpleader is properly filed with an answer to the suit of a claimant. See *Olmos*, 857 S.W.2d at 741 (MUD was sued for breach of contract, interplead funds as answer; summary judgment in favor of MUD held proper). Under the circumstances, the fact that Petro Source waited to file all of its responsive pleadings together does not constitute unreasonable delay. This is particularly true in this case where Petro Source's offer to interplead the funds was essentially undercut by Rattlesnake's immediate response of filing its suit. The record establishes that Petro Source did not delay unreasonably.

**C. Unconditional Tender of Amounts Due**

■ Petro Source, in its petition in interpleader, unequivocally disclaimed any interest in the proceeds interpleaded. Brown specifically disclaimed any interest in the funds at trial. The cases relied upon by Rattlesnake to contest Petro Source's interpleader action as an unconditional tender are inapplicable. See *TPS Freight Distributors, Inc. v. Texas Commerce Bank—Dallas*, 788 S.W.2d 456, 461 (Tex.App.—Fort Worth 1990, writ denied) (involved deposit into registry of court not an interpleader action); *Copelco Leasing Corp. v. Diagnostic Imaging Services of St. Tammany, Inc.*, 891 F.2d 77, 82 (5th Cir.1989) (interpleader continued to assert an interest in funds interpleaded). We find that the evidence at trial established that Petro Source interpleaded the funds unconditionally as a matter of law.

We must now determine if the funds interpleaded represented the entire amount due to Rattlesnake and which Petro Source was holding. Petro Source tendered $219,145.37 into the registry of the court. The jury found that the alleged oral contract between Petro Source and Rattlesnake obligated Petro Source to pay Rattlesnake $18.55 per barrel on 11,795.77 barrels of oil. This figure is established by the evidence reflecting the amount Rattlesnake would have been paid under its contract with Sandhills. Pursuant to the evidence, the amount due Rattlesnake under the alleged oral contract at the date of delivery was therefore $218,811.54. Petro Source thus interpleaded slightly more into the registry of the court than Rattlesnake was due pursuant to its Sandhills contract and its alleged oral contract with Petro Source.

■ Rattlesnake contends, however, that the amount Petro Source deposited is insufficient because it was less than the $245,823.84 the jury eventually awarded Rattlesnake in tort damages. There is no evidence in the record that Rattlesnake ever claimed that Petro Source owed it $245,823.84 prior to the interpleader. Rather, Rattlesnake used the $245,823.84 figure, which was the amount Petro Source agreed to pay Sandhills under

the Petro Source/Sandhills contract, as proof of the "fair market value" of the oil for purposes of its tort damages. To use the jury's eventual tort damage award in this context, however, places the cart before the horse. At the time Petro Source interpleaded the funds, the only amount due Rattlesnake was the $218,811.54 due on the Rattlesnake/Sandhills contract. Petro Source interpleaded an amount in excess of the amount due. Petro Source should have been discharged at that time despite Rattlesnake's additional claims. See *Cable Communications Network, Inc. v. Aetna Casualty & Surety Co.*, 838 S.W.2d 947, 950–51 (Tex. App.—Houston [14th Dist.] 1992, no writ) (upholding summary judgment in favor of interpleading party as to claims for breach of contract, Deceptive Trade Practices, and bad faith). The fact that Petro Source later suffered a judgment in excess of the amount interpleaded should not be used retroactively to attack the initial validity of the interpleader.

■ Rattlesnake further contends that the amount was insufficient because it did not include any amounts for interest or attorney's fees. Rattlesnake neither pleaded nor proved any amount owing for interest and attorney's fees under the oral contract as found by the jury. An interpleader action only requires that "the stakeholder deposit all of the disputed property he has in his possession, even though it might be less than is claimed by one or more of the defendants." *Murphy v. Travelers Ins. Co.*, 534 F.2d 1155, 1159 (5th Cir.1976), citing C. Wright & A. Miller, Federal Practice and Procedure § 1716 at 459 (1972). Accordingly, the evidence established conclusively that Petro Source interpleaded the entire amount due under the oral contract as Rattlesnake alleged it to be.

### Petro Source Not Required to Speculate at its Peril

Rattlesnake argues that Petro Source could have avoided liability to both Rattlesnake and Rattlesnake's creditors by simply returning the oil, or the same amount of oil, to Rattlesnake. Petro Source had, however, sold the oil almost simultaneously with its purchase and was thus holding an identifiable fund made up of proceeds from the sale. Rattlesnake's argument is belied by the federal district court's determination that the IRS lien followed the oil proceeds. See *Petro Source*, 827 F.Supp. at 1269. Additionally, Katherine Dodds testified that she believed that returning similar oil might not relieve Petro Source of the duty to pay Rattlesnake's creditors out of the proceeds. Under the circumstances, Petro Source was not required to speculate as to whether returning the encumbered property, or replacing it with similar property, released Petro Source's liability to Rattlesnake's creditors, or to the IRS, when Petro Source had possession of the proceeds. See *Cable Communications*, 838 S.W.2d at 950 (insurance company not required to determine validity of alleged oral contract between insured lessee and insured's lessor to pay insurance proceeds directly to lessor). To require Petro Source to do so would be to vitiate the purpose of the interpleader cause of action. See *MCZ, Inc.*, 708 S.W.2d at 57.

For the reasons stated above, we find that Petro Source conclusively established its right to interpleader relief.

### Application of Interpleader to Tort Claims

■ Rattlesnake alleged not only breach of contract, but also fraud, breach of the duty of good faith and fair dealing, and tortious interference with the Sandhills/Rattlesnake contract. Texas courts have applied interpleader to discharge parties from liability on extra-contractual claims. See *Cable Communications*, 838 S.W.2d at 950–51. In this unusual factual and procedural posture, however, Petro Source's otherwise legitimate use of its right to interplead the funds actually appears to be in furtherance of the fraud and bad faith Rattlesnake alleges. That is, by interpleading the funds, Petro Source is not paying Rattlesnake directly despite Rattlesnake's failure to clear title as Rattlesnake alleges Petro Source promised to do.

The real issue that Rattlesnake presented at trial is not that Petro Source did not pay, but that Petro Source did not pay Rattlesnake. Rattlesnake had the opportunity to answer Petro Source's interpleader thereby

challenging the IRS and all other claims to the contract proceeds. Rattlesnake instead chose to disclaim all interest in the proceeds and not participate in the interpleader proceeding. Although Rattlesnake filed suit first, Rattlesnake's entire suit essentially amounts to a direct challenge to the interpleader action. Rattlesnake contends that there was no reasonable doubt as to conflicting claims and that Petro Source could not satisfy its payment obligation by interpleading the amount due. The propriety of the interpleader action was established as a matter of law, however, by the evidence in this case and upon entry of final judgment in the interpleader action. See *Petro Source*, 827 F.Supp. at 1265. In reality, Rattlesnake was paid for its oil in the form of a reduction of its debt to the IRS. See *id.*

While we do not hold that interpleader will always discharge a party from liability on the basis of an independent action in tort, in this case, Rattlesnake's pleadings and evidence at trial establish that Rattlesnake's alleged oral contract, fraud, and good faith claims were all based on the same promise: that Petro Source would pay Rattlesnake through Sandhills regardless of existing liens. Likewise, Rattlesnake's tortious interference claim is based on Petro Source's failure to pay Sandhills thereby causing Sandhills to default on its contractual obligations to Rattlesnake. Thus, according to Rattlesnake's pleadings and proof, the single failure by Petro Source to pay Rattlesnake for the oil constituted a breach of contract, a breach of the duty of good faith[3], fraud, and tortious interference with the Rattlesnake/Sandhills contract. If the duty to pay under the alleged contract is satisfied, as it must be, by Petro Source's interpleading the contract price, the interpleader logically cannot fail to satisfy an obligation supported by the very same promise simply because that same promise is alternatively labeled a tort. There can be no tort liability because the alleged oral agree-ment underlying all of Rattlesnake's damages was satisfied by the interpleader. See *Bank of El Paso v. T.O. Stanley Boot Co., Inc.*, 809 S.W.2d 279, 288 (Tex.App.—El Paso 1991), *aff'd in part, rev'd in part on other grounds*, 847 S.W.2d 218 (Tex.1992) (Defendant satisfied contractual obligations, therefore Defendant not liable for tort claims based on same representation). We find that under these circumstances, Petro Source is entitled to rely on interpleader to discharge it from potential liability to Rattlesnake on Rattlesnake's tort claims.

### CONCLUSION

Upon these facts, and in light of Petro Source's offer to interplead the funds in early August, and Rattlesnake's refusal of such method of payment, we find that the interpleader action served to discharge Petro Source from liability to Rattlesnake, as well as to any other claimant competing for the contract funds, as a matter of law. See *Socony*, 372 S.W.2d at 720; *Cable Communications Network*, 838 S.W.2d at 950–951. See also *Olmos*, 857 S.W.2d at 741. (MUD was sued for breach of contract, interplead funds as answer; summary judgment in favor of MUD held proper). We grant Points of Error Two, Seven, and Eight, finding that the evidence conclusively establishes Petro Source's payment and performance of any alleged agreement or representation between it and Rattlesnake in the form of the interpleader. We therefore find it unnecessary to reach Petro Source's six other points of error.

Accordingly, we reverse the judgment of the trial court and render a take-nothing judgment in favor of Petro Source.

KOEHLER, J., not participating.

---

3. Having determined that Petro Source's interpleader entitles it to a discharge from liability to Rattlesnake as a matter of law under these facts, we do not find it necessary to reach the merits of Rattlesnake's tort claim based on good faith and fair dealing at this time. We note, however, that the good faith and fair dealing issue as Rattlesnake submitted it to the jury was nothing more than contractual good faith. Breach of contractual good faith is merely a breach of contract. It is not a separate cause of action sounding in tort, nor does it support an award of exemplary damages. See TEX.BUS. & COM.CODE ANN. § 2.103 (Vernon 1994); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 595 n. 5 (Tex.1992).